NO. 07-06-0165-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

APRIL 17, 2008

_____

SOUTH PLAINS SWITCHING, LTD. CO. AND SOUTH
PLAINS LAMESA RAILROAD, L.L.C., APPELLANTS

v.

BNSF RAILWAY COMPANY f/k/a THE BURLINGTON
NORTHERN AND SANTA FE RAILWAY COMPANY, APPELLEE

_____

FROM THE 72nd DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2004-526,559; HON. RUBEN REYES, PRESIDING

_____

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J.[1]

This case arises because of disputes between South Plains Switching, Ltd. Co.

(SAW), South Plains Lamesa Railroad, L.L.C. (SLAL), and Burlington Northern Railway

Company, formerly known as Burlington Northern and Santa Fe Railway Company (BNSF).

History

Because of the convoluted and extensive history of these disputes, it is necessary

to go into that history in some detail. BNSF is a Class I railroad whose principal business

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2007).

is the transportation of freight in the western, midwestern, and southwestern regions of the United States. SAW and SLAL are known as "shortline" railroads that operate in the vicinities of Lubbock and Slaton, Texas. They provide switching services to BNSF and its customers.

In the early 1990s, major Class I railroads such as BNSF began selling off portions of their rail lines located near industrial centers or that served rural areas, and the sales from which were known as "Shortline Sales." In 1993, prior to its merger with the Burlington Northern Railway Company (Burlington Northern), the Santa Fe Railroad Company (Santa Fe) sold a portion of its line running generally southwest from Slaton to Lamesa, Texas, to SLAL. The agreement between those parties was memorialized in what is referred to here as the SLAL Asset Sale Agreement. It provided that Santa Fe conveyed to SLAL rail freight transportation business that it had formerly conducted on the rail lines but it reserved the right to set through routes and rates for customers. SLAL was to be paid by a division of revenue by which SLAL would receive a certain amount of money per car that was handled by the parties on the line covered by the agreement.

In 1999, after Santa Fe and Burlington Northern merged and became BNSF, the entity sold to SAW approximately fourteen miles of its track that served industrial customers in east Lubbock. This sale was memorialized in another Asset Sale Agreement. The SAW Asset Sale Agreement provided that for cars that were billed in units of 27 or more, the charge rate was to be $400 per car. SAW and SLAL share common ownership.

The Fort Worth Suit

Soon after the SAW Asset Sale Agreement was finalized in 1999, disputes arose between the parties which resulted in a declaratory judgment action brought by BNSF in

Fort Worth in 2002. In its suit, BNSF asked the court to declare that: 1) SAW could not unilaterally impose a surcharge on traffic without its consent; 2) SAW was not entitled under the SAW Asset Sale Agreement to acquire further assets of BNSF; 3) the SAW Asset Sale Agreement did not limit or proscribe BNSF from providing rail service to Vulcan Materials on Track 9200 (which SAW contended had been sold to it together with business to be conducted on it); 4) that a 1999 quitclaim deed delivered pursuant to the SAW Asset Sale Agreement included tracks referred to as the "Burris Tracks" by mistake and the deed should be reformed; 5) that the term "billed" as used in the pertinent provision of the SAW Asset Sale Agreement meant "billed to the customer" and did not mean "waybilled" for purposes of division of revenue; and 6) the SAW Asset Sale Agreement did not impose liability on BNSF for what might be termed "wrongful deprivation of rent."

SAW and SLAL responded to the suit with counterclaims alleging various breaches by BNSF of the SAW Asset Sale Agreement including: 1) unreasonably withholding consent to SAW's proposed surcharge; 2) providing rail service to Vulcan Materials on Track 9200; 3) continuing to serve customers on the Burris Tracks; and 4) improperly paying the division of revenue based on customer billing instead of waybills. They also made claims that BNSF had improperly transferred properties described in the SAW Asset Sale Agreement to a property management company which had then sold or disposed of the properties.

Prior to trial, BNSF successfully filed a motion to exclude SAW's and SLAL's damage testimony. SAW and SLAL then non-suited their counterclaims for breach of contract and damages. The case then proceeded to trial on BNSF's declaratory judgment claims that: 1) it did not act unreasonably by refusing to consent to SAW's surcharge on

its customers of $40-$60 per car; 2) that under the SAW Asset Sale Agreement, it had reserved the right to serve Vulcan Materials on Track 9200; 3) that the Burris Tracks were included by mistake in the 1999 quitclaim deed executed by it in connection with the Asset Sale Agreement and the deed should be reformed to correct that error; and 4) the term "billed" referred to in the agreement meant billed to the customer and did not mean "waybilled" as contended by SAW.

After a four-day jury trial, the jury found that SAW had the right to impose a surcharge upon its customers, that BNSF had access rights to Track 9200 for storage purposes only, that the division of revenue under the agreement was to be paid on a waybill basis and not on a freight bill basis, and that the Burris Tracks had been validly conveyed to SAW. Those findings were incorporated into a final judgment which was appealed by BNSF to the Fort Worth Court of Appeals. The trial court judgment was affirmed with the exception that the appellate court held that BNSF was entitled to use Track 9200 for other than storage purposes. *See Burlington Northern & Santa Fe Railway Co. v. South Plains Switching Ltd., Co.,* 174 S.W.3d 348 (Tex. App.–Fort Worth 2005, no pet.).

The Lubbock Suit

The suit directly underlying this appeal was filed in Lubbock on June 1, 2004. In it, SAW asserted that BNSF had breached the Asset Sale Agreement and was liable because BNSF had: 1) unreasonably withheld consent to a surcharge; 2) wrongfully provided rail service to Vulcan Materials on Track 9200 and refused to allow SAW to serve Vulcan Materials on the track; 3) improperly continued to serve customers on the Burris Tracks;

4

4) paid less than it should have under the division of revenue provisions of the Asset Sale Agreement; and 5) failed to appropriately deal with SAW on certain real estate claims.

Additionally, SAW and SLAL claimed that BNSF had breached a duty of good faith and fair dealing warranting an award of exemplary damages. They also claimed they were entitled to specific performance and mandatory injunctive relief pursuant to the Asset Sale Agreement. Moreover, SLAL claimed that BNSF had breached its Asset Sale Agreement by diverting Vulcan Materials' trains or by refusing to allow Vulcan Materials' trains to be routed to SLAL.

Subsequently, BNSF filed a motion seeking a partial summary judgment dismissing all claims that had been asserted by SAW and SLAL in the Fort Worth suit and subsequently nonsuited on the basis that they were barred under the compulsory counterclaim rule, Texas Rule of Civil Procedure 97. This motion was granted by the Lubbock trial court. The effect of the granting of this motion was that issues regarding the surcharges and payment under the freight bill were eliminated from the Lubbock County trial and the claims relating to Vulcan Materials' trains, the Burris traffic and lease assignments were barred as to events occurring prior to the date of the filing of the Lubbock case on June 1, 2004.

At the conclusion of evidence, the trial court granted BNSF's motion seeking dismissal of SAW and SLAL's quest for recovery because of breach of a duty of good faith and fair dealing with consequent exemplary damages. At the conclusion of the trial, eight questions were submitted to the jury. In its answers to questions 1 and 2, the jury found that BNSF had failed to comply with the SLAL Asset Sale Agreement by wrongfully diverting 18 Vulcan Materials trains to its yard in Slaton, Texas, and thereby caused

5

damages to SLAL in the amount of $70,500.  In answers to questions 3 and 4, the jury found that BNSF failed to comply with the SLAL Asset Sale Contract by refusing to direct or allow any of the Vulcan Materials trains described in SLAL's exhibit 12 to use Track 9200 or to use a SAW switching track which caused damages to SAW in the amount of $2,928.93.

In its answers to questions 5 and 6, the jury found BNSF failed to comply with the SAW Asset Sale Agreement by refusing to allow SAW to serve traffic which damaged SAW in the amount of $27,296.85. In its answers to questions 7 and 8, the jury found that BNSF had failed to comply with the Asset Sale Agreement by failing to assign the West Texas Industries lease which caused damages to SAW in the amount of $12,600.

Subsequent to the return of the jury verdict, BNSF filed a motion for judgment n.o.v. in which it contended that SAW and SLAL's lost profit calculations were improper as a matter of law.  The trial court granted the motion in regard to the jury findings in Questions 2, 4, and 6, but left intact the jury findings in Questions 7 and 8.  The trial court then entered judgment granting SAW relief on the real estate issues and for its attorney's fees but denied all of SLAL's equitable requests and most of SAW's equitable requests.

In pursuing their appeal, SAW and SLAL raise four issues for our discussion.  In their first issue, they contend that the trial court erred in granting BNSF's motion for partial summary judgment excluding all of their claims prior to June 1, 2004, because the Fort Worth court's judgment is not *res judicata* to those claims and the claims were not compulsory counterclaims.

In their second issue, relating to good faith and fair dealing exemplary damages, they argue that the trial court erred in granting BNSF's motion for directed verdict because

6

the "special relationship" between the parties supports the placing of such a duty and, thus, it follows that a claim for exemplary damages should also have been allowed.

Their third issue concerns their injunctive relief/specific performance claims. They reason that the trial court erred in granting judgment n.o.v. denying those claims because they established their right to those claims either as a matter of law, or, in the alternative, by the great weight and preponderance of the evidence.

In their fourth issue, they posit that the trial court erred in granting BNSF's motion for judgment n.o.v. and in denying them damages for the wrongful diversion of Vulcan trains and the wrongful refusal of BNSF to allow SAW to service the Burris customers.

Summarized, this appeal is a challenge to the trial court's ruling on three BNSF motions, namely, its motion for partial summary judgment, in which it held that SAW could not re-litigate the contract claims that were initially brought in the Fort Worth suit but then non-suited; its motion for directed verdict in which the trial court held there was no factual basis to support the claims for breach of an alleged duty of good faith and fair dealing; and its motion for directed verdict in which the trial court held that appellants' "lost profits" calculations were improper.

BNSF Motion for Partial Summary Judgment

The standards by which summary judgments are reviewed are by now axiomatic. When reviewing a summary judgment, the reviewing court takes as true all evidence favorable to the nonmovant, and resolves any doubts and indulges any reasonable inferences in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997). The summary judgment is reviewed *de novo*, and, when the trial court's order

7

does not specify the ground or grounds relied upon for its ruling, it will be affirmed on appeal if any of the theories advanced are meritorious. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

BNSF's motion rested upon Texas Rule of Civil Procedure 97, the compulsory counterclaim rule. In relevant part, that rule provides:

> a. **Compulsory Counterclaims**. A pleading shall state as a counterclaim any claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction; . . . .

As we have noted, in the Lubbock case, SAW contended that BNSF breached the Asset Sale Agreement and became liable for damages because: 1) BNSF unreasonably withheld consent to a disputed surcharge; 2) BNSF provided rail service to Vulcan Materials on Track 9200 and failed to allow SAW to serve Vulcan Materials on that track; 3) BNSF continued to serve customers on the Burris Tracks and would not allow SAW to do so; 4) under the SAW Asset Sale Agreement, BNSF paid less to SAW than it was required to do; and 5) BNSF failed to properly deal with SAW on "real estate claims." Thus, SAW's affirmative relief claims replicated the counterclaims it had asserted, but non-suited, in the Fort Worth case.

A counterclaim is compulsory if: 1) it arises out of the transaction or occurrence that gives rise to the opposing party's claim; 2) it is mature and owned by the counterclaimant; 3) it is against an opposing party in the same capacity; 4) it does not require third parties who cannot be brought into the suit; 5) it is within the court's jurisdiction; and 6) it is not

8

pending elsewhere. Tex. R. Civ. P. 97(a); *Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 247 (Tex. 1988). If a claim meets those elements, it must be asserted in the initial action and cannot be later raised. *Id.*

Our Supreme Court has adopted a transactional approach in determining whether the compulsory counterclaim rule is applicable in a given case. It has instructed that in determining whether a transaction is within the purview of the rule, weight should be given to "such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage." *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 631 (Tex. 1992), *citing* Restatement of Judgments, §§24(1) & 24(2). This court has noted that the Rule 97a "same transaction or occurrence" requirement has been broadly construed. *See Lesbrookton, Inc. v. Jackson*, 796 S.W.2d 276, 281 (Tex. App.–Amarillo 1990, writ denied). Additionally, where as here, there is a legal relationship such as under a lease or contract, all the claims that arise from that relationship will arise from the same subject matter and be subject to the application of the rule in a proper case. *Sanders v. Blockbuster, Inc.,* 127 S.W.3d 382, 386 (Tex. App.–Beaumont 2004, pet. denied); *see also Weiman v. Addicks-Fairbanks Road Sand Co.*, 846 S.W.2d 414, 419 (Tex. App.–Houston [14th Dist.] 1992, writ denied). However, where a defendant's claim to affirmative relief asserts a theory distinct from and independent of the issues raised in a plaintiff's claim, it is not a compulsory counterclaim. *Astro Sign Co. v. Sullivan*, 518 S.W.2d 420, 426 (Tex. Civ. App.–Corpus Christi 1974, writ ref'd n.r.e.)

9

In contending that Rule 97a is not applicable, SAW argues that BNSF's claims are too broad and posits that a party is not required to bring every claim based on a contract in a particular suit, particularly when it covers several different matters which could involve different fact scenarios, different witnesses, and different theories of recovery. SAW characterizes its real estate claims as involving the asserted failure of BNSF to assign leases to SAW, and, in addition, that BNSF did not assign "other income" (*i.e.* rent) that was due it under the Asset Sale Agreement, as well as the purported fraudulent "transfer of some or all of the properties involved either before or after the signing of the Asset Sale Agreement."

However, in the Lubbock case, SAW asserted that pursuant to the Asset Sale Agreement, a quitclaim deed was prepared that purportedly assigned it certain leases and rental income and claimed it was damaged because BNSF had failed to properly assign those leases and the rental income from them. The record shows that those were the same leases at issue in the Fort Worth case. That being so, the compulsory counterclaim rule would be applicable and would prevent the relitigation of those real estate claims in the Lubbock case. *Sanders v. Blockbuster, Inc.*, 127 S.W.3d at 386.

With regard to the Burris Tracks, both parties asserted claims involving them in the Fort Worth case. BNSF sought a declaration that the Asset Sale Agreement did not include the Burris Tracks because of a mutual mistake, and SAW counterclaimed that BNSF had breached the agreement by "continuing to serve Lubbock Feeders subsequent to May 3, 1999" and by "continuing to serve Jarvis Metals on Tracks 7 and 12 at Burris . . . ." SAW chose to non-suit its Burris Track claims in the Fort Worth case when it received an adverse ruling on its damages.

10

In the Lubbock case, SAW again alleged that the failure of BNSF to allow it to service customers along the Burris Tracks constituted a breach of the Asset Sale Agreement. Those Burris Track claims involved the same subject matter as the Fort Worth case. If the compulsory counterclaim rule was applicable, and we think it was, the trial court's summary judgment in that regard was proper. *See Compass Exploration, Inc. v. B-E Drilling Co.*, 60 S.W.3d 273, 278-79 (Tex. App.–Waco 2001, no pet.).

Both parties had claims in the Fort Worth case concerning SAW's request for a surcharge and BNSF's refusal to give consent. BNSF sought declaratory relief and SAW sought damages. When its damage testimony was excluded, SAW non-suited its surcharge counterclaim. BNSF's surcharge claim was submitted to the jury and it received a favorable answer. In the Lubbock case, SAW again asserted its surcharge claim that BNSF unreasonably withheld consent to a surcharge and sought damages for its refusal to give consent. Once more, this controversy arose out of the same subject matter as that involved in the Fort Worth case and thus was subject to the compulsory counterclaim rule. *See id.*

Both BNSF and SAW asserted claims in the Fort Worth case concerning operations on Track 9200. BNSF claimed that under the Asset Sale Agreement, it retained all rights to access and utilize Track 9200 and asked the court to so construe the agreement. SAW counterclaimed that BNSF violated the Asset Sales Agreement by refusing to recognize its right to dispatch trains on Track 9200. After it received an unfavorable ruling on its damages evidence, SAW chose to nonsuit its Track 9200 claim.

In the Lubbock case, SAW again asserted that BNSF failed to comply with its right to dispatch traffic on Track 9200 and thereby prevented it from providing direct rail service

11

to its customers. This was done in language identical to that used by it in its non-suited counterclaim in the Fort Worth case. It arose out of the same Asset Sale Agreement in dispute in the Fort Worth case. Relitigation of the question was thus barred by the compulsory counterclaim rule. *See id.*

Again, in the Fort Worth case, SAW contended that a dispute existed between BNSF and SAW concerning the meaning of "billed" as used in the division of revenue provision in the Asset Sales Agreement and that BNSF breached the agreement by paying it less than that to which it was entitled. BNSF asked for a declaratory order construing that provision of the agreement and received a favorable result.

Because that issue was litigated in the Tarrant County trial, it is subject to the compulsory counterclaim rule and cannot be relitigated in the Lubbock County case. We have considered SAW's argument that the compulsory counterclaim rule only applies to issues that were specifically submitted as jury issues in the prior case and that its right to non-suit counterclaims in the Fort Worth suit was unqualified and absolute. However, we believe that the compulsory counterclaim rule is broader than the doctrine of *res judicata,* and, in a case such as this one, is applicable. *See Weiman v. Addicks-Fairbanks Road Sand Co.*, 846 S.W.2d at 421. The first point is overruled.

BNSF Motion for Directed Verdict

In their second point, SAW and SLAL contend the trial court erred in granting BNSF's motion for directed verdict on their quest for exemplary damages because the terms of the Asset Sale Agreements, the relationship between the parties, and the superior bargaining position of BNSF gave rise to a duty of good faith and fair dealing between them and BNSF. In considering this point, we recognize the established rule that a plaintiff is

12

entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence. The task of a reviewing court is to consider all the evidence in a light most favorable to the party against whom the verdict was instructed, discarding all contrary evidence and inferences, and determine whether there is any evidence of probative force to raise fact questions on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex. 1978).

In support of their point, appellants place considerable weight upon the decision in the seminal case of *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex. 1987). In that case, the court found there is a duty on the part of insurers to deal fairly and in good faith with their insured. *Id.* at 167. In doing so, the court noted that it had declined to impose an implied covenant of good faith and fair dealing in every contract but, "a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract." *Id.* In the course of its discussion and in the context of insurance contracts, the court specifically noted that an insurance company had exclusive control over the evaluation and processing and denial of claims and that in such instances, the nature of insurance contracts gave rise to unequal bargaining power "which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims." *Id.*

Appellants contend that provisions in the agreements concerning such matters as their grant to BNSF of exclusive rate-making authority and the necessity for them to obtain dispatch authority from BNSF as to when they might use the main track or enter BNSF's two yards for interchange of trains to be spotted to customers is sufficient evidence of unequal bargaining power between the parties similar to that existing between insurance

13

companies and their insureds. They argue that BNSF's control of rate making authority and use of its track together with its sole dispatch authority over its main line is so similar to an insurance company's control of its claim process as to give rise to a duty of good faith and fair dealing similar to that imposed upon insurance companies by the *Arnold* court.

However, our Supreme Court has recognized that there is no general duty of good faith and fair dealing in ordinary arm's length commercial transactions. *See Formosa Plastics Corp. USA* v. *Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 52 (Tex. 1998); *see also Wil-Roye Inv. II v. Washington Mut. Banks, F.A.,* 142 S.W.3d 393, 410 (Tex. App.–El Paso 2004, no pet.) (the duty of good faith and fair dealing does not arise in ordinary commercial transactions). In *Lovell v. Western Nat'l Life Ins. Co,* 754 S.W.2d 298 (Tex. App.–Amarillo 1988, writ denied), this court noted the explication in the *Arnold* case as holding that the duty of good faith and fair dealing does not exist in Texas unless intentionally created by express language in a contract or unless a special relationship of trust and confidence exists between the parties to the contract. *Id.* at 302-03.

Indeed, in *Farah v. Mafrige & Kormanik,* 927 S.W.2d 663 *(*Tex. App.–Houston [1st Dist.] 1996, no writ), cited by appellants, the court explicated that "[t]he fact that one businessman trusts another and relies upon another to perform a contract does not rise to a confidential relationship*."* *Id.* at 675-76. In *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477 (Tex. App.–Corpus Christi 1989, writ denied), although the court recognized the rule that certain types of contracts might lead to the finding of a special relationship of such a nature as to give rise to a cause of action in tort, the court cautioned that the special relationship cause of action did not extend to ordinary commercial relationships. *Id.* at 481.

14

In *English v. Fischer*, 660 S.W.2d 521 (Tex. 1983), also cited by appellants, the Court had occasion to discuss a theory prevalent in California law that in every contract there was an implied covenant of good faith and fair dealing. In refusing to accept such a concept, the Court cautioned that to do so, would "let each case be decided upon what might seem 'fair and in good faith' by each fact finder," which the Court was unwilling to do. *Id.* at 522.

Suffice it to say, this record is sufficient to support the trial court's evident conclusion that the agreements were the result of arm's length dealing between the parties and was not of a nature to demonstrate a "special relationship" sufficient to support a tort duty of good faith and fair dealing. As appellants recognize, under the Punitive Damages Act, the term "malice" is defined as a specific intent to cause substantial injury or harm to a plaintiff. *See* Tex. Civ. Prac. & Rem. Code Ann. §41.001(7) (Vernon Supp. 2007)*.* Additionally, the trial court did not reversibly err in concluding the evidence insufficient to support the submission of exemplary damages to the jury. Appellants' second issue is overruled.

Specific Performance and Injunctive Relief

In their third issue, appellants contend that the trial court erred in denying their request for specific performance and injunctive relief. The purpose of specific performance is to compel a party who is violating a duty under a valid contract to comply with his obligations. The rationale for that remedy is that the recovery of monetary damages would be inadequate to compensate the complainant and thus the transgressor should be compelled to perform that which he had promised in his contract. *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 225 (Tex. Civ. App.–San Antonio 1980, writ ref'd n.r.e.). It is a fundamental rule of equity that specific performance may not be granted unless it is shown

15

there is no adequate remedy at law. *American Housing Resources, Inc. v. Slaughter*, 597 S.W.2d 13, 15 (Tex. Civ. App.–Dallas 1980, writ ref'd n.r.e.). The burden of invoking the court's equity jurisdiction is on the party seeking it and the comparative advantages of the equitable remedy must be shown to outweigh those of the legal remedy. Among the factors to be considered are whether long-continued supervision by the court will be required, whether complete relief can be rendered by the remedy sought, and whether, if the remedy sought is granted, it can be adequately enforced. *Id*. A court generally will not decree a party to perform a continuous series of acts which extend through a long period of time and require constant supervision by the court. *Canteen Corp. v. Republic of Texas Properties, Inc.,* 773 S.W.2d 398, 401 (Tex. App.–Dallas 1989, no writ).

In this case, appellant's quest for specific performance, in its essence, was one seeking a mandatory injunction. When a trial court grants, or refuses, a permanent injunction, the standard of review is whether it committed an abuse of discretion. The test for determining whether a trial court abused its discretion is whether it acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985).

SAW asked that BNSF be ordered to:

1) Interchange to SAW all trains headed to customers on the Burris Tracks owned by BNSF, not to attempt to relocate any business from customers on the Burris Tracks owned by BNSF, and refrain from attempting to relocate any of the business from customers on the Burris Tracks.

2) Interchange all Vulcan Materials' trains headed to Lubbock, Texas to SAW for unloading on Track 9200 and refrain from requiring Vulcan Materials to lease or use any BNSF track in the Lubbock area for unloading operations on trains routed to SAW; and

3) Refrain from charging two different discriminatory freight rates for trains destined to Lubbock, Texas.

16

Examination of the Asset Sale Agreement reveals that although it gave SAW title to the Burris Tracks, it made no specific provision for its operation on BNSF's mainline to get there. The record supports the trial judge's evident conclusion that SAW had not suffered an irreparable injury and that it did have an adequate remedy at law in the form of contract damages if a breach of the contract had occurred. Additionally, the record would support the court in concluding that the grant of a mandatory injunction in a situation such as was presented to it would require continued onerous judicial supervision. In sum, this record does not show that the court erred in concluding that SAW did not meet the prerequisite requirements to justify the equitable remedy it sought in connection with the Burris Tracks.

Appellants also sought a judicial prohibition preventing BNSF from quoting different freight rates for trains destined to Lubbock and Slaton, Texas. In doing so, they argued that they had lost business from Vulcan Materials because BNSF had established different through rates. However, the record shows that they did not specify or demonstrate the amount of business they may have lost because of such rates or that they lost Vulcan Materials or any other entity as a customer. Those losses would have been susceptible of determination. Thus, under this record, they did not make the showings of a lack of an adequate remedy at law or irreparable injury requisite to support the equitable relief they sought.

Additionally, the Asset Sale Agreement specifically provided that BNSF "shall have authority to establish through routes and offer through freight rates via through routes involving both [appellants] and [BNSF] with interchange between [appellants] and [BNSF] . . . ." The Agreements also stated that appellants "automatically concur in all such

17

through rates established by [BNSF] . . . so long as [appellants] receive for transporting the traffic [their] division of revenues . . . ." There are no provisions in the Asset Sale Agreement preventing BNSF from charging different through rates for traffic interchanged with appellants, and we find no evidence produced at trial that the parties intended otherwise. In sum, the trial court could reasonably conclude that the specific performance sought by appellants in this regard would have compelled conduct inconsistent with the agreements.

Likewise, the record does not show evidence that appellants suffered imminent irreparable injury with no remedy at law because of BNSF's practices in handling Vulcan Materials' trains. Indeed, appellants sought and received from the trial jury money damages tied to BNSF's diversion of Vulcan Materials' trains and its refusal to allow Vulcan Materials to use Track 9200.

Moreover, even though SAW argues that BNSF had locked the switch to Track 9200 which had the effect of denying it the ability to serve Vulcan Materials on that track, SAW acknowledged at trial that it still had access to Track 9200 when the switch was locked, and that on the trial date, the switch was no longer locked. Thus, the record does not show the requisite irreparable injury related to BNSF's conduct but does demonstrate that there was an adequate remedy at law in the form of contract damages.

Appellants also contend that BNSF assigned the Vulcan Materials business in the Asset Sale Agreements. However, perusal of the agreements demonstrates there are no provisions restraining BNSF from serving customers such as Vulcan Materials on its own rail line. Thus, appellants did not show any entitlement to specific performance. In sum, appellants' third issue is overruled.

18

Damages

In their fourth issue, appellants contend the trial court reversibly erred in granting BNSF's motion for judgment n.o.v. regarding appellants' recovery of damages for the wrongful diversion of Vulcan trains and the refusal of BNSF to allow SAW to service the Burris customers.

A trial court may grant a judgment n.o.v. if there is no evidence to support one or more of the jury's findings on issues necessary to liability or, conversely, if the evidence established an issue as a matter of law. *Brown v. Bank of Galveston, N. A.,* 963 S.W.2d 511, 513 (Tex. 1998); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex. App.–Houston [1st Dist.] 1992, writ denied).

In responding to appellants' fourth issue, BNSF argues that although appellants now argue that they were entitled to "benefit of the bargain" damages, in their pleadings, they only claimed damages based upon "lost profits" and/or lost revenue. Moreover, during the course of the trial, appellants continued to argue that they had lost profits and revenues because of BNSF's breaches of the Asset Sale Agreements. They did offer a trial amendment after the close of evidence seeking recovery of benefit of the bargain damages but the trial judge refused to let them do so. Thus, under this record, they were not entitled to submission of that theory and we are relegated to the task of determining whether the testimony they produced was sufficient to support a "lost profits" recovery.

In a breach of contract action such as this one, the measure of damages is just compensation for the loss or damage actually sustained. *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952). The measure of damages for the loss of profit as consequential damages means net profits. Net profits means what remains in the conduct

19

of a business after deducting from its total receipts all of the expenses incurred in carrying on the business. The lost profits need not be susceptible to exact calculation, but must only be shown to a reasonable certainty. An award of damages may be based on estimates that are based upon objective facts, figures or data. *Interceramic, Inc. v. South Orient R.R. Co., Ltd.*, 999 S.W.2d 920, 929 (Tex. App.–Texarkana 1999, pet. denied)*; Turner v. PV Intern. Corp.,* 765 S.W.2d 455, 465 (Tex. App.–Dallas 1988, writ denied).

Appellants assert the testimony of Larry Wisener is sufficient to establish their lost profits. Wisener testified as to the division of revenue that would be received by appellants on each train in issue and in considerable detail about the amount of fuel cost that would be used in handling those trains. However, there was no testimony about other necessary expenses of doing business such as depreciation, payroll expenses, administrative expenses, equipment expenses, and maintenance expenses. In sum, Wisener's testimony falls short of fulfilling the requirement that lost profits be shown with reasonable certainty. *See Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex. App.–Fort Worth 2004, pet. denied). Thus, the trial court did not reversibly err in disregarding the jury's answers to questions 2, 4, and 6. Appellants' fourth issue is overruled.

### BNSF'S Cross-Appeal

In presenting its cross-appeal, BNSF presents three issues for our decision. First, it asserts the evidence is legally and factually insufficient to support the jury's answers to questions 7 and 8. In question 7, the jury was queried whether BNSF failed to comply with the Asset Sale Agreement by failing to assign the West Texas Industries lease or rent to SAW. Question 8 was predicated on an affirmative answer to question 7 and inquired as

to what sum of money would compensate SAW for its damages, if any, resulting from the failure to assign the West Texas Industries lease. In arriving at its answer, it was instructed that it might only consider the "amount of rent under the lease from West Texas Industries, Inc. paid to BNSF after May 1, 2004." The answer was $12,600.

It is not disputed in the record that: 1) the property covered by the West Texas Industries lease was within the property description of the land to be conveyed to SAW by quitclaim deed under the SAW Asset Sale Agreement and that the Asset Sale Agreement was signed on May 3, 1999; 2) the property covered by that lease was conveyed by BNSF to a third party by a special warranty deed on June 29, 1999; 3) the quitclaim deed was executed by BNSF on June 29, 1999, but was not delivered on that date and was held by BNSF pending closing. The Asset Sale Agreement closed, and the quitclaim deed was delivered to SAW on July 2, 1999. It is undisputed that the lease was reconveyed to BNSF by the third party on October 25, 2002.

SAW argues that BNSF was obligated to assign it either the West Texas Industries lease or the rent generated from the lease. In support of that position, it relies upon section 1(e) which provides:

> Seller [BNSF] shall assign to Buyer [SAW] on the day of closing, subject to all terms and conditions set forth in this agreement, or in any agreement assigned by Seller to Buyer in accordance with the terms of this agreement, all assignable rights and obligations of Seller to the extent that they are related to the rail line and are set forth in any agreement identified in Exhibit D which is attached hereto . . . .  If any contract is related to the rail line and inadvertently not identified in Exhibit D, it is the intent of Seller and Buyer that such contract be deemed to have been assigned by Seller to Buyer in whole or part as appropriate effective the date of closing.

It also relies upon section 12 of the agreement which provides:

21

Prepaid rentals, utilities and other income or fees attributable to the contracts related to the rail line that are being assigned under ¶ 1 of this agreement, shall be prorated between Buyer and Seller in such a manner as to allocate to Seller all income received and all expenses incurred, on or prior to the date of closing, and to allocate to Buyer all income received, and expenses incurred after the date of closing.

SAW contends that under the contract BNSF's obligation was continuing and that when the property was deeded back to BNSF, it had an obligation to transfer the lease back to SAW. However, BNSF's obligation under the contract was only to deliver a quitclaim deed. While a warranty deed to land conveys property, a quitclaim deed conveys only the grantor's right in it, if any. *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 (Tex. 2005). A quitclaim deed conveys upon its face doubts about a grantor's interest and a buyer is necessarily put on notice as to those doubts. The record demonstrates that the quitclaim deed was delivered subsequent to the time that BNSF had no title to the lease. Consequently, it could not be liable for, and there is no evidence to support the jury answers to questions 7 and 8.

Additionally, the statute of limitations for a breach of contract is four years. Tex. Civ. Prac. & Rem. Code Ann. §16.051 (Vernon 1997). The limitations period begins to run when the cause of action accrues. When the legislature employs the term "accrues" without an accompanying definition, it is the responsibility of the courts to determine when the cause of action accrues and thus when the statute of limitations begins to run. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex. 1990). An action for damages for breach of a written contract accrues when the breach occurs or when the claimant has notice of facts sufficient to place him on notice of the breach. *Rose v. Baker & Botts*, 816 S.W.2d 805, 810 (Tex. App.–Houston [1st Dist.] 1991, writ denied). Assuming, *arguendo,* that BNSF had breached

22

the Asset Sale Agreement by failing to assign the West Texas Industries lease, that breach occurred on July 2, 1999. If BNSF was required to assign leases in some way other than by quitclaim deed, on July 2, 1999, when the deal was closed, SAW must have actual knowledge that there were no lease assignments made. However, SAW did not make its breach of contract claim until June 1, 2004, some five years later. The claim is barred by limitations.

Likewise, SAW's claims relating to the Furr's Cafeteria and Brite Trucking leases accrued on the date of the closing of the Asset Sale Agreement, and, like the other claims, SAW did not make its breach of contract claim in that regard until June 1, 2004, some five years later. Those claims are also barred by limitations.

SAW additionally contends that it is entitled to receive one-half of all of the rent payments received by BNSF from the B & R Auto lease. However, it is undisputed that the land leased to B & R Auto was not included in the description of land to be covered by quitclaim deed as provided in the Asset Sale Agreement. All that SAW received on that tract was an easement to operate on tracks crossing the land. It is SAW's contention that a landowner is obligated to share rent proceeds with those holding easements on the land. We disagree. An easement extends to certain persons or entities the right to use the land of another for the purpose or purposes specified in the easement and does not convey title to the property. *Magnolia Petroleum Co. v. Caswell*, 1 S.W.2d 597, 600 (Tex. Comm'n App. 1928, judgm't adopted); *Long Island Owner's Ass'n v. Davidson*, 965 S.W.2d 674, 684 (Tex. App.–Corpus Christi 1998, pet. denied). That being so, SAW would not be entitled to any portion of rentals owed by B & R Auto for the use of the property.

For the reasons we have expressed, the judgment of the trial court is modified to delete those portions of the judgment awarding $12,600 in damages to SAW with respect to the West Texas Industries lease, to delete that portion of the judgment awarding injunctive relief and specific performance to SAW, to delete that portion of the judgment awarding attorney's fees to SAW, and to provide that SAW take nothing on those claims. As modified, the judgment is affirmed. Tex. R. App. P. 43.2.


John Boyd
Senior Justice