Reversed and Rendered in Part and Affirmed
in Part and Opinion filed December 30, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00889-CV



Jennifer L.
Kellmann, Appellant 

v.

Workstation
Integrations, Inc., Appellee 



On Appeal from
the 129th District Court

Harris County, Texas

Trial Court
Cause No. 2006-04708



 

OPINION

This appeal arises out of litigation between a
company and its former employee who resigned and opened a competing business. 
We must determine whether the evidence is legally and factually sufficient to
support the trial court’s judgment on jury findings that the former employee committed
a theft of trade secrets and breached a fiduciary duty during her employment and
that, as a result, the former employer is entitled to damages in the form of
lost profits and attorney’s fees.  Finding no evidence to support the award of
lost profits and no “prevailing party” status for the recovery of attorney’s
fees, we reverse the judgment in part and render judgment that the former
employer take nothing.  We affirm the remainder of the judgment.

I.         Factual And Procedural Background

Appellant Jennifer Kellmann worked as a senior
consultant for appellee Workstation Integrations, Inc. for approximately six
years.  During this time, Workstation Integrations  provided computer support
to small and mid-size oil and gas companies that did not maintain full-time
computer-support staff.  Primarily, Workstation Integrations used specialized
software to interpret seismic data the customer provided.  Founded in 1993 by
Lee and Laura Kay Ethetton, the company hired its first employee, Marc Roulston,
in 1997. The following year, Workstation Integrations hired Kellmann, who was
experienced in computer technology and had a background as a geophysicist. 
Workstation Integrations did not ask Kellmann to sign a confidentiality or
non-compete agreement.

During her first five years with the company,
Kellmann enjoyed her job and felt part of a team.  In 2003, however, Lee left
the company for a sabbatical for about five months, and the Ethettons
divorced.  During this time, Laura Kay, Roulston, and Kellmann were very busy
at Workstation Integrations.  When Lee returned in October 2003, Workstation
Integrations decided to make changes in the delegation of client responsibilities. 
Under the new policy, each client was to have both a primary contact and a
secondary contact who were to be equally familiar with the client’s needs. 
Kellmann was to serve as the primary contact for five clients, and Lee was to
be the primary contact for fifteen clients.  Laura Kay and Roulston also had
primary responsibility for several clients.  

Kellmann felt the assignments were a “double edged
sword.”  She wanted Lee back at work because her workload had been overwhelming
in his absence, but the new policy also meant a loss of income for her, as she
was compensated on a salary-plus-commission basis.  Additionally, according to
Kellmann, many clients had developed relationships with specific people at
Workstation Integrations, and they wanted to contact the individual of their
choice regardless of the company’s primary and secondary designations.

In early 2004, Workstation Integrations was losing
clients as a result of a downturn in the oil industry.  At that time, Lee and
Laura Kay called a team meeting to discuss how the company could stay in
business and be profitable during the economic downturn.  At the same time,
Workstation Integrations decided to implement written policies.  Under the
written policies, Workstation Integrations’s employees were not permitted to
discuss with clients “the personal situation between Lee and Laura” or internal
disagreements.  Complaints about Workstation Integrations’s personnel were to
be immediately reported to Laura Kay.  

During this same time frame, Workstation Integrations
issued an employee handbook Laura Kay had authored.  The handbook provided that
“[Workstation Integrations does] not allow personal use of Company property
unless specifically authorized in this Handbook.”  The handbook also provided
that “[a]ll emails sent to or received from a client are considered company
business,” and included a provision regarding the improper disclosure of
“sensitive information, confidential information, proprietary information or
trade secret information.” 

Kellmann became increasingly frustrated with
Workstation Integrations.  She believed that her work was not appreciated and she
occasionally lashed out at the Ethettons.  Disagreements erupted between
Kellmann and Lee regarding Kellmann’s noncompliance with Workstation
Integrations’s new policies.  Kellmann also sometimes failed to provide
Workstation Integrations with her monthly time sheets by the first of the
month.  In February 2004, Lee sent Kellmann an email outlining several
criticisms of her work.  Kellmann believed the email signaled that Workstation
Integrations wanted to terminate her employment.  She forwarded the email to
Tracy Grace, who worked for Woodside, a Workstation Integrations client.  Kellmann
expressed her concern to Grace, as well as her desire to seek a position with
Woodside.  

In March 2004, Kellmann was advised that a client she
had been servicing, Mariner, would be assigned to Lee as the primary contact
and Kellmann as the secondary contact.  Though unhappy with the decision, Kellmann
accepted it and ultimately complied with it.  But problems continued and
Kellmann again complained to Grace at Woodside.  In an email, Kellmann stated
that “the straw that broke the camel’s back happened yesterday” and surmised
that she would “probably go solo for awhile.”  In another email, Kellmann
explained to Grace that she was very angry and indicated that she was still interested
in the potential job opportunity with Woodside.  Kellmann also wrote, “I’m
going to need to know whether or not to take some of my other clients with me
when I go.  I’d like to just out of spite, but wouldn’t be able to if the
Woodside gig is a full-time contract.”  

In late June 2004, Kellmann received a call from a
representative of a client, Fairfield, who was upset that he had not received a
quote for a piece of equipment.  Lee was the primary contact for Fairfield. 
Kellmann called Laura Kay and asked if she could provide the quote; Laura Kay
told Kellmann that she would contact Lee about it.  Kellmann claimed that she did
not call Lee because Lee did not return her calls.  Later, Lee sent Kellmann a
highly critical email chastising her for not contacting him and directing her
to meet with him to discuss the incident.  Kellmann was taken aback by the
email because she did not believe she had done anything wrong; she believed
that Workstation Integrations wanted to get rid of her.  Kellmann decided to
resign.

            Kellmann
met with Lee on July 2 as he had requested.  Lee gave her a paycheck, and, in
return, Kellmann gave him her resignation letter.  In the letter, Kellmann
stated that her last day would be July 16, 2004, “unless deemed otherwise.” 
Kellmann and Lee agreed that she would continue to work for Workstation
Integrations and service clients for the next two weeks.  Shortly after that,
Kellmann emailed Susan Poorman-Blackie, a woman employed with another
Workstation Integrations client, Bois d’Arc:

I just wanted to let you know that I quit Workstation
Integrations on Friday.  Lee had some more unprofessional and insulting email
for me on Thursday along with a voice mail.  I decided that I’d rather quit
than be treated like that.  I emotionally and physically couldn’t handle the
stress any more.

More than likely, I’ll start my own consulting firm once
I’ve completed my two weeks (or less) at WI.  No worries.  You guys will be
taken care of.  The best way to get ahold [sic] of me is going to be back on my
old cell phone.

Poorman-Blackie responded: 
“Good to hear from you.  You did the right thing, no doubt.  Life is too long
for mistreatment.  I like Kellmann Consulting.  I’ll call you today, but I’m
hoping we will be on your customer list?”

A few days before Kellmann’s scheduled departure, Laura
Kay conducted a final “exit lunch” with Kellmann. At the meeting, Kellmann
returned items Laura Kay had requested, including the employee manual, a tool
kit, and computer hardware.  Kellmann still had one, older-model personal
computer belonging to Workstation Integrations, but Laura Kay told her she
could keep it.  Kellmann left her employment with Workstation Integrations on
July 16, 2004, as scheduled. 

Less than a week after leaving Workstation
Integrations, Kellmann incorporated Kellmann Consulting, Inc.  Because of her
personal relationship with many of Workstation Integrations’s clients, those
clients opted to send their business to Kellmann and her new company.  As a
result, Workstation Integrations lost most of its business.  

In December 2004, Workstation Integrations, through
its lawyer, requested Kellmann to return its old computer.  After retrieving
the computer, Workstation Integrations sent it for a forensic analysis.  The
analysts were able to recover some deleted files, and to determine that the
computer had been accessed several times by an “external device” indicating
that data was transferred on or off the system.  Workstation Integrations’s
analysts also found that the day Kellmann resigned, there appeared to be
deletions of files and some copying of files, including emails and email
attachments relating to former Workstation Integrations clients.  

Workstation Integrations filed suit against Kellmann
and Kellmann Consulting  alleging claims for tortious interference with
contract and business relationships, defamation, slander, violations of the
Texas Penal Code, unfair competition, conversion, breach of fiduciary duty, misappropriation
of confidential information and trade secrets, and claims under the Computer
and Fraud Abuse Act.  Kellmann and Kellmann Consulting answered the suit and Kellmann
asserted a counterclaim for breach of contract and intentional infliction of
emotional distress.

The case was tried to a jury.  Workstation
Integrations withdrew its claims under the Computer and Fraud Abuse Act as well
as its claims for defamation, business disparagement, and unfair competition,
and the trial court directed a verdict against Workstation Integrations on its tortuous-interference
claim.  Workstation Integrations requested and received a trial amendment to
plead a claim under the Theft Liability Act.  The trial court denied Kellmann’s
motion for directed verdict on Workstation Integrations’s claims for misappropriation
of trade secrets, breach of fiduciary duty, and conversion.  The trial court
granted a directed verdict against Kellmann on her claims for intentional infliction
of emotional distress and attorney’s fees.

The jury found Kellmann committed a theft of trade
secrets, misappropriated trade secrets, and breached her fiduciary duty.  Workstation
Integrations elected the jury’s award of $135,986 for theft of trade secrets
and the jury’s $12,500 award for breach of fiduciary duty for a total damage
award of $148,486.  The trial court awarded Workstation Integrations $148,486
in actual damages, $25,832.50 in prejudgment interest, and $35,000 in
reasonable and necessary attorney’s fees against Kellmann individually.  The
trial court did not award any recovery against Kellmann Consulting.  The trial
court also rendered a take-nothing judgment in favor of Workstation
Integrations against Kellmann and Kellmann Consulting.  The trial court denied
Kellmann’s motion for judgment notwithstanding the verdict and motion for new
trial.

On appeal, Kellmann challenges, among other things, the
legal and factual sufficiency of the evidence of lost profits.[1]  

II.        Legal Insufficiency

When both the legal and factual sufficiency of the
evidence are challenged, we first review the legal sufficiency of the evidence
to determine whether the record contains any evidence of probative value to
support the factfinder’s decision.  See Manon v. Tejas Toyota, Inc., 162
S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  In a
legal-sufficiency or no-evidence review, we consider the evidence in the light
most favorable to the challenged finding and indulge every reasonable inference
that would support it.  City of Keller v. Wilson, 168 S.W.3d 802, 823
(Tex. 2005).  We must credit favorable evidence if a reasonable factfinder
could and disregard contrary evidence unless a reasonable factfinder could not.
 See id. at 827.  We must determine whether the evidence at trial would
enable reasonable and fair-minded people to find the facts at issue.  See
id.  

Evidence is legally insufficient “[w]hen (a) there is
a complete absence of evidence of a vital fact, (b) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact, (c) the evidence offered to prove a vital fact is no more
than a scintilla, or (d) the evidence conclusively establishes the opposite of
the vital fact.”  Merrell Dow Pharms., Inc. v. Havner, 953 S.w.2d 706,
711 (Tex. 1997).  Evidence that is “‘so weak as to do no more than create a
mere surmise or suspicion’ that the fact exists” is less than a scintilla.  Kroger
Tex., Ltd. P’ship v. Suberu, 216 S.W.3d 788, 793 (Tex. 2006) (quoting Ford
Motor Co. v. Ridgeway, 135 S.W.3d 598, 601 (Tex. 2004)).

Lost profit estimates or opinions must be based on
objective facts, figures, or data from which the lost profits amount may be
ascertained.  ERI Consulting Eng’rs, Inc. v. Swinnea, 318 S.W.3d 867, 876
(Tex. 2010); Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex.
1994); Holt Atherton Indus., Inc. v. Heine, 835 SW.2d 80, 84–85 (Tex.
1992).  When a review of the surrounding circumstances establishes that the
profits are not reasonably certain, there is no evidence to support the lost
profits award.  Formosa Plastics Corp v. Presidio Eng’rs and Contractors,
960 S.W.2d 41, 50 n.3 (Tex. 1998); Capital Metro. Transp. Auth. v. Central
of Tenn. Ry. & Navigation Co., 114 S.W.3d 579–82 (Tex. App.—Austin
2003, pet. denied).  In our legal-sufficiency analysis, we thus review whether
competent evidence establishes the amount of lost profits awarded with
reasonable certainty.  See Swinnea, 318 S.W.3d at 876.

Lost profits are damages for the loss of net income
to a business and, broadly speaking, reflect income from lost-business
activity, less expenses that would have been attributable to that activity.  Miga
v. Jensen, 96 S.W.3d 207, 213 (Tex. 2002).  A claimant must demonstrate one
complete calculation of lost profits.  Heine, 835 S.W.2d at 84.  The
calculation of lost-profits damages must be based on net profits, not gross
revenue or gross profits.  Heine, 835 S.W.2d at 83 n.l; Turner v. PV
Int’l Corp., 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988), writ denied
per curiam, 778 S.W.2d 865 (Tex. 1989).

The only witness who testified at trial as to
Workstation Integrations’s claims of lost profits was Laura Kay, who holds a
finance degree.  She testified that she analyzed Kellmann’s revenue from
2004-2007 invoices, and tax returns for Kellmann and Kellmann Consulting.[2] She
determined that Kellmann invoiced clients in the amount of $94,204.88 in 2004,
$346,698.80 in 2005, $175,982.77 in 2006, and $146,391.35 in 2007, for a total
of $763,277.80 over that time period.  Laura Kay did not provide the jury with any
other figures.  Kellmann’s counsel objected that there was insufficient
evidence of lost profits.

            The
figures Laura Kay provided to the jury were purely gross numbers that did not
account for any expenses, such as software licenses, medical insurance, rent,
phone bills, taxes, employee salaries or any equipment costs.  Laura Kay
admitted that the numbers she provided to the jury were purely gross numbers:

Q:  [By Workstation
Integrations’s counsel] Now, adding those annual totals together from 2005 to
2005, 2006, and 2007, what's the total amount for those four years that Ms.
Kellmann billed your clients?

 

A:  [By Laura
Kay] The total is $763,277.80.

 

Q:  You’re
not contending that she didn’t have some expenses, are you, out of this?

 

A:  No.
This indicates revenue only.  This is invoice totals.

 

Q:  Do you
know the details of her expenses?

 

A:  No, I
did not.

 

Laura Kay conceded that she
could not determine Kellmann’s expenses from the tax returns.  And the summary Laura
Kay prepared specifically states that it “doesn’t reflect a deduction for
expenses.”  Workstation Integrations presented no other evidence on this issue. 


Workstation Integrations’s evidence of gross figures,
rather than net revenue, does not establish lost profits.  See, e.g.,
South Plains Switching, Ltd. v. BNSF Ry. Co., 255 S.W.3d 690,
696 (Tex. App.—Amarillo 2008, pet. denied) (testimony insufficient to establish
lost profits when testimony related only to revenues, and there was no
testimony offered concerning expenses); Texaco, Inc. v. Phan,
137 S.W.3d 763, 772 (Tex. App.—Houston [1st Dist.] 2004, no pet.)
(plaintiffs failed to meet their burden of proving net profits); Atlas Copco
Tools, Inc. v. Air Power Tool & Hoist, Inc., 131
S.W.3d 203, 209 (Tex. App.—Fort Worth 2004, pet. denied) (finding no evidence
of lost profits where evidence was offered only as to gross profits).  

Workstation Integrations’s lawyer attempted to cure
the lack of evidence on lost profits during her closing argument by providing
new numbers to the jury that she claimed took into account the deduction of
Kellmann’s expenses for equipment sales, taxes and licenses, and business
expenses.  But Workstation Integrations’s lawyer’s gross revenue numbers did not
compare to, or even remotely match, the numbers Laura Kay had provided from the
witness stand.  Nor did Workstation Integrations’s lawyer identify or explain
the origin of the expense figures she was providing that Laura Kay had been
unable to provide.  Workstation Integrations’s lawyer’s statements during
closing argument do not constitute evidence.  See McCain v. NME Hosps., Inc.,
856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ) (“Motions and arguments of
counsel are not evidence.”).  At least one Texas court has held that a monetary
figure provided by counsel during cross-examination of a witness and that
apparently was derived from invoices was “no evidence to support the jury’s lost
profit award.”  See Mood v. Kronos Products, Inc., 245 S.W.3d 8, 11
(Tex. App.— Dallas 2007, pet. denied).  We do not consider these statements in
our evaluation.

Workstation Integrations argues that Kellmann
testified that her after-tax income in 2004 was $61,862; in 2005, $82,749; in
2006, $88,130; and in 2007, $84,359.[3] 
But Texas courts have rejected the argument that gross sales reflected in tax
returns can support an award of lost profits.  See Rusty’s Weigh
Scales and Serv., Inc. v. N. Tex. Scales, Inc., 314 S.W.3d 105, 111 (Tex.
App.—El Paso 2010, no pet.).  Additionally, this court recently has rejected a
similar attempt to show lost profits through lost gross revenues.  See Wiese
v. Pro Am Servs., Inc., 317 S.W.3d 857, 863–64 (Tex. App.—Houston [14th
Dist.] 2010, no pet.).  Moreover, Kellmann testified that her after-tax income
figures for 2004 also included salary and commissions for her work with
Workstation Integrations though June 2004.  Kellmann also testified that “quite
a big number” of the gross revenues were for equipment sales, which makes the invoice
total deceptive.  Workstation Integrations acknowledges that Kellmann did not
provide an estimate or other figures representing equipment sales.  

During rebuttal, Laura Kay testified that Workstation
Integrations’s standard markup on equipment sales, “[f]or a large piece of
equipment, [was] normally around 20 percent.”  She agreed that equipment sales
continued to be a major source of revenue “for someone in her industry” from
2004 through the present.  But Laura Kay’s testimony regarding Workstation
Integrations’s average markup on equipment did not provide evidence from which
lost profits may be calculated with reasonable certainty.  Laura Kay testified
only to Workstation Integrations’s general average markup for “large” equipment;
her testimony did not account for other equipment or expenses, and Kellmann
testified that the gross figures include equipment, software, and license
costs.  Further, testimony about Workstation Integrations’s typical mark-ups
does not constitute evidence as to actual costs to Kellmann.  Without Kellmann’s
costs deducted from the relevant invoices, it is impossible to discern
Kellmann’s net profits.  Workstation Integrations’s attempt to apply its own
costs to Kellmann’s gross profits did not provide the jury with the required “one
complete calculation” of lost profits.  See Swinnea, 318 S.W.3d
at 876; Holt Atherton Indus., Inc., 835 S.W.2d at 84–85.

The requirement that Workstation Integrations suffered
damages is an element of each of its liability theories.  Lost profits was the
sole measure of damages considered by the jury and awarded to Workstation
Integrations in the judgment under each of Workstation Integrations’s theories
of recovery.  

We have determined that the evidence is legally
insufficient to demonstrate lost profits with reasonable certainty.  Our
holding that Workstation Integrations presented legally insufficient evidence
of damages also precludes the award of attorney’s fees under the Theft
Liability Act because Workstation Integrations is not a prevailing party.  See
Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b) (West 2005); Glattly v.
Air Starter Components, Inc., ___ S.W.3d ___, No. 01-09-00098-CV, 2010 WL
3928480, at *7–8 (Tex. App.—Houston [1st Dist.] Oct. 7, 2010, no pet. h.).   Because
the evidence of lost profits is legally insufficient,[4] we reverse
and render judgment that Workstation Integrations take nothing from Kellmann.[5]

III.      Conclusion

We sustain Kellmann’s first issue, and reverse and
render judgment that Workstation Integrations take nothing on its claims
against Kellmann.   The remainder of the judgment is affirmed.                                                                                   

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

 

 

 

Panel consists of Justices Anderson,
Frost, and Brown.









[1] Kellmann also challenges the
legal and factual sufficiency of the evidence of causation of damages,
existence of trade secrets, theft of trade secrets, misappropriation of trade
secrets, existence of a confidential relationship, breach of fiduciary duty,
and attorney’s fees.  She also contends the awards of damages under the Theft
Liability Act and breach-of-fiduciary-duty claims are based on the same injury
and damages in violation of the “one satisfaction” rule.  Concerning her own
claims, Kellmann contends that the trial court abused its discretion in
excluding evidence of disparaging emails from her employer, the trial court
erred in directing a verdict on her intentional infliction-of-emotional-distress
claim, the jury’s failure to find that Workstation Integrations breached the
agreement to pay her commission was against the great weight and preponderance
of the evidence or the claim was established as a matter of law, and the trial
court erred in directing a verdict on Kellmann’s claim for attorney’s fees
because she satisfied the “presentment” requirement of Texas Civil Practice and
Remedies Code section 38.002.  As explained in the text that follows, we do not
reach these issues.

 





[2]
In her testimony, Laura Kay acknowledged that, in her industry, tax returns are
not customarily relied upon for this purpose.





[3]
Workstation Integrations also points to Laura Kay’s testimony that the company
would incur no substantial additional overhead to service the lost clients, had
those clients continued to use Workstation Integrations’s services, because the
remaining employees could have handled the work and the overhead would have
been substantially the same for three as for four employees.  Laura Kay
acknowledged, however, that when Workstation Integrations hired Wendy Crawford
in October 2006, it would have had increased personnel costs.





[4] All of the actual damages the
jury awarded were for lost profits.  Because the legal sufficiency of the
evidence of lost profits damages is dispositive, we do not reach Kellmann’s
remaining issues concerning Workstation Integrations’s claims against her.  





[5]
At oral argument, counsel for Kellmann informed this court that Kellmann would
waive her issues concerning her counterclaims if this court were to reverse and
render judgment that Workstation Integrations take nothing on its claims. 
Based on Kellmann’s waiver of these issues, we affirm that portion of the trial
court’s judgment rendering a take-nothing judgment in favor of Workstation
Integrations on Kellmann’s and Kellmann Consulting’s counterclaims.