The BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Appellant,

v.

SOUTH PLAINS SWITCHING, LTD. CO., Appellee.

No. 2–04–364–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 26, 2005.

Rehearing Overruled Sept. 15, 2005.

Kelly, Hart & Hallman, P.C., Donald E. Herrmann, Jeffrey R. Grable, Caj D. Boatright, Michael D. Roper, Fort Worth, for Appellant.

James L. Gorsuch, Lubbock, and Thomas F. McFarland, Chicago, IL, for Appellee.

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

This case arises from a dispute over the meaning of certain provisions in an Asset Sales Agreement (the Agreement) between Appellant Burlington Northern and Santa Fe Railway Company (BNSF) and Appellee South Plains Switching, Ltd. Co. (South Plains). After careful consideration of Appellant's issues, we affirm in part and reverse and render in part.

### BACKGROUND AND PROCEDURAL HISTORY

BNSF and South Plains executed the Agreement in May 1999. Under this Agreement, BNSF conveyed to South Plains certain "rail line" properties (tracks) in Lubbock, Texas, and certain rail freight transportation business conducted on those tracks. The tracks conveyed were known as the "Lower Yard." Under the Agreement, BNSF retained its "through route" business, conveying to South Plains only the "switching services" provided to BNSF's "through route" customers.

"Through route" business consists of shipments that originate with BNSF at one location and, although some of the shipping takes place on rail lines owned by other carriers, continue to be billed by BNSF for the entire trip. South Plains' switching services for these shipments includes interchanging cars and moving them to and from the industry track destinations on the rail lines conveyed to South Plains by the Agreement. For these switching services, South Plains receives a "division of revenue." South Plains began operations under the Agreement on July 5, 1999.

During negotiations surrounding the creation of the Agreement, South Plains expressed an interest in acquiring additional properties known as the North Yard. No official arrangements were made with regard to the North Yard property before execution of the Agreement. From execution of the Agreement in 1999 through mid–2001 there were conversations between BNSF and South Plains regarding the sale of the North Yard.

Sometime in June or July 2001, BNSF informed South Plains that the property and switching operations for the North Yard were not for sale, ending any negotiations regarding the conveyance of that property. On January 17, 2002 and February 4, 2002 South Plains wrote letters to BNSF requesting BNSF's consent to impose surcharges on all cars interchanged (or "switched") by South Plains. South Plains explained the need for a surcharge by stating that it had underbid the "divi-

sion of revenue" deal under the Agreement because it relied on oral promises that the North Yard would be conveyed, thereby providing South Plains with another source of revenue.

On February 22, 2002, exercising its rights under the Agreement, BNSF denied consent to the surcharge request, stating its belief that the additional surcharge would adversely affect its volume of business because shippers might resort to using trucks instead of paying the extra rail line fee. BNSF initiated an action for declaratory judgment on the surcharge issue on April 16, 2002. South Plains asserted several counterclaims that were either disposed of through summary judgment or nonsuited prior to trial.

The case proceeded on four declaratory judgment claims brought by BNSF. The jury answered adversely to BNSF on all four jury questions regarding the parties' rights under the Agreement. The court denied BNSF's motions for directed verdict, judgment notwithstanding the verdict, and a new trial. On August 23, 2004, the trial court rendered judgment on the verdict. In three issues, BNSF appeals the trial court's judgment.

## SURCHARGE ISSUE

In its first issue, BNSF contends that the jury's finding that BNSF unreasonably withheld consent to South Plains' surcharge request is not supported by the judgment for two reasons. First, the trial court erred by refusing to instruct the jury on the proper legal meaning of the term "unreasonably." Second, the evidence is legally and factually insufficient to support the jury's finding.

### Was a definition required?

The phrase in question used in the Agreement is as follows: "[South Plains] shall not impose a surcharge upon [rail] traffic without the prior written consent of [BNSF], which consent shall not be unreasonably withheld."

BNSF asserts that without an instruction from the trial court defining the term "unreasonable," the jury incorrectly applied its own subjective definition of the term, rather than the proper legal meaning, which resulted in an improper verdict. In support of its contention, BNSF relies upon *Mitchell's Inc. v. Nelms*, 454 S.W.2d 809, 813 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.).

Texas courts have not settled on a legal definition of "unreasonable." "What constitutes the elements of unreasonableness in the act of withholding consent presents a question not simple in resolution." *Id.* In *Mitchell's*, the court held that a landlord did not unreasonably withhold consent to a sublease as mandated by the terms of the lease. *Id.* at 814. In reaching this decision, the court examined the specific terms of the lease to determine the intention of the parties. *Id.* After considering the lessor's reason for denying consent, the court examined the original intention of the parties as evidenced in the lease and decided that the lessor did not act unreasonably or arbitrarily. *Id.* at 815.

In examining the elements of unreasonableness in the act of withholding consent, the *Mitchell's* court noted that unreasonable conduct compares to arbitrary action. *Id.* at 813-14. The court also mentioned the definition of arbitrary—"without fair, solid and substantial cause or reason." *Id.* However, the word "arbitrary" is only used as a "yardstick" in *Mitchell's* to show that for something to be reasonable it must be something more than arbitrary. *Id.* The *Mitchell's* court did not hold that overcoming arbitrariness equates to reasonableness. *See id.*

*Mitchell's*, in fact, proposes several meanings for the term "unreasonable," in-

cluding a definition of the word from Webster's dictionary and definitions applied by other courts. *Id.* The *Mitchell's* court did not rely on any particular definition of unreasonable but instead "made reference to various definitions of 'reasonable' and 'unreasonable,' including the definition supplied by Webster's Dictionary, but did not approve any specific language that would necessarily be suitable for a jury instruction." Terry I. Cross, *The Ties That Bind: Preemptive Rights and Restraints On Alienation That Commonly Burden Oil and Gas Properties,* 5 TEX. WESLEYAN L.REV. 193, 224 n. 182 (1999).

Furthermore, "[a]lthough the court in *Mitchell's* discussed various definitions of unreasonableness *in the abstract,* it relied on the specific terms of the contract to hold that the landlord had acted reasonably in withholding his consent." *B.M.B. Corp. v. McMahan's Valley Stores,* 869 F.2d 865, 868 (5th Cir.1989) (emphasis added). Further interpreting *Mitchell's,* the *B.M.B.* court opined, "[i]t thus appears that under Texas law, the reasonableness of a refusal to consent ... is determined by reference to the terms and conditions of the original ... [agreement]." *Id.* at 869.

The conclusion reached in *B.M.B.* is consistent with another case decided by the Fifth Circuit in which the jury instruction stated: "The term 'unreasonable withholding of consent' means that a decision to withhold consent is made without any reasonable basis.... [T]he question is whether there was any reasonable basis *under the circumstances* for the decision[ ] ... to withhold its consent." *Perez v. Jefferson Standard Life Ins. Co.,* 781 F.2d 475, 479 (5th Cir.1986) (emphasis added). The court, rather than supplying a legal definition of the word "unreasonable," allowed the jury to apply a meaning to the word based on the circumstances or evidence presented. *Id.*

According to another court, the standard is generally anything that falls below what a reasonable person in like circumstances would do. *Haack v. Great Atl. & Pac. Tea Co.,* 603 S.W.2d 645, 650 (Mo.Ct.App.1980). What equates to reasonable or unreasonable cannot be readily defined. *See id.* Unreasonableness is relative, and "[e]very case must be judged on its own particular facts." *Id.*

However, an interpretation of *Mitchell's* in a reporter's note to the Restatement Second of Property claims that "a general statement of what constitutes unreasonableness in this area [landlord granting sublease to tenant] was given in *Mitchell's* ... that being: without fair, solid and substantial cause or reason." RESTATEMENT (SECOND) OF PROPERTY § 15.2 note (1977). The proper standard applicable to the reasonableness of a landlord's refusal to consent to an assignment or sublease is that of a reasonable person in the landlord's position. *Funk v. Funk,* 102 Idaho 521, 524–25, 633 P.2d 586, 589–90 (1981).

Moreover, in determining whether a lessor is acting unreasonably in denying a sublease or assignment, courts have examined various factors, including the intended use of the property, the financial status of the proposed tenant, and the evidence supporting the commercial reasonableness of the denial. *See Pletz v. Standard Homes Co.,* 342 S.W.2d 621, 621 (Tex.Civ.App.-San Antonio 1961, no writ) (holding that landlord's desire to prevent business competition between tenants justified his refusal to consent to sublease without first obtaining knowledge of intended use of property); *Johnson v. Jaquith,* 189 So.2d 827, 829–30 (Fla.Dist.Ct.App.1966) (holding landlord's refusal to consent to assignment is not unreasonable without proof of prospective assignee's financial status); *Bismarck Hotel Co. v. Sutherland,* 175 Ill. App.3d 739, 125 Ill.Dec. 15, 529 N.E.2d

1091, 1097 (1988) (stating that a suitable sublessee is "one who is ready, willing and able to sublease the premises and who, at least, meets reasonable commercial standards"), *appeal denied,* 124 Ill.2d 553, 129 Ill.Dec. 147, 535 N.E.2d 912 (1989).

■ Here, BNSF asserts that the trial court erred by not instructing the jury to apply a strict definition of the term "unreasonable" as used in the phrase "unreasonably withhold consent" in the Agreement between BNSF and South Plains. BNSF contends that because the trial court refused to instruct the jury as to the definition of "unreasonable," it was unfairly held to a higher standard of care. South Plains argues that the legal definition of "unreasonable" was not adopted by the *Mitchell's* court or by any other court in Texas. We agree. Because no legal definition of "unreasonable" has been adopted or approved by Texas courts, the trial court did not err by refusing to submit a definition of the word "unreasonable" to the jury. We hold that the jury was free to consider the ordinary meaning of the phrase in light of the evidence presented.

### *Legal and Factual Sufficiency*

BNSF contends that the evidence is legally and factually insufficient to support the jury's finding that BNSF unreasonably withheld its consent to South Plains' surcharge request. BNSF argues that the evidence conclusively established that its refusal to consent was reasonable because the surcharge 1) was nothing more than a negotiating tactic, 2) was arbitrary, having no economic or analytical basis, 3) would have adversely affected the volume of rail traffic, and 4) was itself patently unreasonable.

■ A legal sufficiency challenge may only be sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if reasonable jurors could, and disregard evidence contrary to the finding unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

■ An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

■ Here, the jury heard testimony regarding the circumstances and background of BNSF's backing out of the North Yard sale, as well as its denial of the surcharge based on economic reasons. Larry Wisener manager/president for South Plains Switching,[1] testified that he was informed

---

1. The record reveals that Larry Wisener signed the Agreement as "manager/president"

by BNSF personnel that if South Plains performed well, the North Yard would be conveyed to South Plains. Larry Cronin, a former employee of BNSF, testified that Jerry Johnson, also an employee of BNSF, told him that if South Plains did a good job, BNSF would convey the North Yard to South Plains. There was also testimony that Johnson announced at a luncheon that BNSF's intent was to convey the North Yard to South Plains. There was testimony that South Plains initially accepted a lower division of revenue because it was under the impression that it would eventually receive the North Yard tracks and the imposition of the surcharge would not have been necessary if the North Yard had been conveyed to South Plains, as promised by BNSF.

Wisener testified that in considering whether to request a surcharge, he calculated revenues lost from not acquiring the North Yard as promised by BNSF and what it would take to cover current expenses of operation. He testified that requesting the surcharge was not used as any type of tactic. The jury heard testimony from Johnson that before making his decision to deny South Plains' request for the surcharge, he did not obtain or request the records of South Plains, he did not look at the cost and expenses of South Plains, and he did not meet with anyone from South Plains to talk about the surcharge request.

The jury could have determined that BNSF's denial of South Plains' request for a surcharge was unreasonable. Accordingly, we hold that the evidence in this case was legally and factually sufficient to support the jury's finding. We overrule BNSF's first issue.

## ACCESS TO TRACK 9200

■ The Agreement between BNSF and South Plains contains a "Description of Business Sold" section conveying the *property interests* in certain rail line segments, including track 9200, from BNSF to South Plains. The Agreement states that this grant is subject to BNSF's retained interests including "continued access by rail" to track 9200. Immediately following this provision is a subsection granting South Plains the *rail freight transportation business* conducted by BNSF on the rail line segments conveyed but, subject to the aforementioned retained interests.

Prior to execution of the Agreement, BNSF conducted freight transportation business with Vulcan Construction Materials, L.P. (Vulcan) on track 9200. For nearly four years after the execution of the Agreement in May of 1999, BNSF continued to conduct its business with Vulcan on track 9200. In 2003, South Plains denied BNSF access to track 9200 to service Vulcan. Both BNSF and South Plains claim that the other party's actions regarding track 9200 violate the terms of the Agreement. It is BNSF's position that the retained interest of "continued access by rail" reserved for BNSF the right to continue conducting that portion of its freight transportation business with Vulcan on track 9200. BNSF claims that the ordinary meaning of the phrase "continued access" as used in the Agreement, unambiguously permits BNSF to *use* track 9200

for South Plains Switching. Wisener testified that South Plains Switching was formed for the purpose of entering into the Asset Sale Agreement with BNSF. He also stated that South Plains Switching does not have any

employees or equipment. In order to operate South Plains Switching, employees and equipment from South Plains Lamesa, another railroad owned by Wisener, are utilized.

to the extent that it had before the Agreement.

South Plains argues that the language of the Agreement grants South Plains the freight transportation business conducted on track 9200, including all the business done with Vulcan, and that the "continued access" provision of the Agreement is for storage purposes only. South Plains maintains that the word "access" refers to the right to *approach,* not *use* the track.

In its second issue, BNSF argues that the jury's finding that the "continued access" provision of the Agreement does not permit BNSF to continue to service Vulcan on track 9200 fails to support the judgment because 1) the provision unambiguously permits BNSF unrestricted continued access to track 9200 and should have been enforced by the trial court as a matter of law, and 2) the trial court erred by admitting parol evidence regarding South Plains' intended meaning for the unambiguous provision.

■■■■ An unambiguous contract must be construed by the court as a matter of law and not left open to the interpretation of its terms by a jury; however, it is proper to allow the trier of fact to interpret an ambiguous contract. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). The question of whether a contract is ambiguous is one of law for the court. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* A contract is not ambiguous if its words can be given a definite or certain meaning as a matter of law. *Coker,* 650 S.W.2d at 393. Not every difference in the interpretation of a contract amounts to an ambiguity. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994). When a potential ambiguity arises, deciding whether the language is

ambiguous is an issue of contract construction. *Candlelight Hills Civic Ass'n, Inc. v. Goodwin,* 763 S.W.2d 474, 477 (Tex.App.-Houston [14th Dist.] 1988, writ denied).

Webster's Dictionary defines "continued" as both "stretching out in time or space without interruption" and "resumed after interruption." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 493 (2002). Applying these definitions, the use of the word "continued" within the Agreement can be interpreted to mean either continued from a point *before the Agreement* was executed or continued *throughout the Agreement* without interruption.

"Access" is defined by the same dictionary as both the "ability to enter, approach, ... or pass to and from" and the "ability to ... make use of." *Id.* at 11. Accordingly, access can mean either the right to make *use* of or the ability or right to *approach.* BNSF contends that the phrase "continued access" is not ambiguous when given its plain, ordinary, and generally accepted meaning.

■■■■ From the phrase alone, it cannot be ascertained which definition of "access" the parties intended, *"use"* or *"approach."* However, individual words, phrases, or clauses should not be isolated and read out of context, but rather the document should be read as a whole to determine the intentions of the parties as expressed in the writing. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995). To achieve this the court will examine and consider the entire instrument so that none of the provisions will be rendered meaningless. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex.1980). If the written instrument permits the court to ascertain a definite interpretation as to which one of two possible meanings is proper, the contract is not ambiguous. *Id.* It is pre-

sumed that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc.,* 939 S.W.2d at 121.

Within the clause of the Agreement that reserves "continued access by rail to track 9200," there is an additional provision stating that BNSF will pay $1000 per year for such continued access beginning six years from the date of closing "and thereafter until such time as [BNSF] notifies [South Plains] in writing, that [BNSF] no longer desires to use said tracks." South Plains' contention that the "access" was limited to the right to "approach" the tracks but not to "use" them renders this portion of the Agreement meaningless. Therefore, by applying the applicable rules of construction and interpretation, which requires construing the contract as a whole, we conclude the "right to use" track 9200 is the only reasonable interpretation of the meaning of "access" from the face of the Agreement.

When the Agreement is read as a whole, the term "continued access" is unambiguous. Therefore, the trial court erred by admitting parol evidence regarding the parties' intended meaning for this unambiguous provision, and erred in submitting a jury question regarding interpretation of the term "continued access" in the Agreement. *See Transcon. Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex. App.-Houston [1st Dist.] 2000, pet. denied) (stating that a trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder). We sustain BNSF's second issue and render a declaratory judgment that the Agreement's "continued access" provision permits BNSF to continue to use track 9200 with no restrictions, except payment after five years as provided by the terms of the Agreement.

THE MEANING OF "BILLED"

Under the Agreement, when a freight shipment is interchanged between BNSF and South Plains, BNSF bills the freight customer for the whole shipping movement and then shares the revenue with South Plains according to the division of revenue provision. South Plains receives $40 for each carload of freight "billed in a block of 27 or more cars for an individual shipper or receiver," and a higher rate of $125 for each carload of freight "billed" in a block of less than 27 cars.

A dispute arose between the parties over the meaning of the term "billed," as used in the division of revenue provision. South Plains took the position that "billed" meant "waybilled"—i.e., that it should receive $125 for each car "waybilled" in less than a block of 27 cars. BNSF responded that "billed" meant "billed to the customer"—i.e., if BNSF billed a customer at lower unit train rates (because cars moved in a block of 27 cars or more) then South Plains was paid at the lower rate of $40.

The jury was asked to determine whether the intent of the parties at the time they signed the Agreement was that the term "billed" in the division of revenue provision meant "billed to the customer" or "waybilled." The jury answered that the term meant "waybilled."

 In issue three, BNSF asserts that the term "billed" used in the Agreement unambiguously means "billed to the customer" rather than "waybilled." Alternatively, BNSF argues that the evidence is legally and factually insufficient to support the jury's finding.

 When a term in a written agreement is not specifically defined, it should be given its plain, ordinary, and generally accepted meaning. *Heritage Res., Inc.,* 939 S.W.2d at 121. If a written contract is worded so that it can be given a

definite or certain legal meaning, then it is not ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Coker,* 650 S.W.2d at 393. Parol evidence is not admissible for the purpose of creating an ambiguity. *See Nat'l Union,* 907 S.W.2d at 520. If, however, the language of a contract is subject to two or more reasonable interpretations, it is said to be ambiguous. *Id.* Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex.1996). In particular, a specialized industry or trade term may require extrinsic evidence of the commonly understood meaning of the term within a particular industry. *See Nat'l Union,* 907 S.W.2d at 521 & n. 6.

Here, the term at issue in the Agreement is "billed." The division of revenue provision of the Agreement does not contain the words "waybilled," "billed to the customer," or "freight bill." BNSF's contention that the term "billed" is unambiguous would require us to conclude that there is only one reasonable interpretation of the term "billed" as used in the Agreement between BNSF and South Plains.

An ambiguity in a contract may be said to be "patent" or "latent." *Id.* at 520. A patent ambiguity is evident on the face of the contract. *Id.* A latent ambiguity arises when a contract that is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. *Id.* If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *Id.* When a latent ambiguity arises, the focus shifts to the facts and circumstances under which the agreement was made. *GTE Mobilnet of S. Tex. Ltd. v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 290 (Tex.App.-Houston [1st Dist.] 1997, writ denied) (op. on reh'g).

Once a contract is found to be ambiguous, the interpretation of the contract becomes a fact issue. *Coker,* 650 S.W.2d at 394. Where application of the language used to the subject matter of the contract creates a genuine uncertainty as to which of two meanings is correct, the issue is properly resolved by a jury. *Sec. Sav. Ass'n v. Clifton,* 755 S.W.2d 925, 930 (Tex.App.-Dallas 1988, no writ).

The trial court heard testimony regarding the facts and circumstances of the making of the Agreement. The testimony included the use of the terms "freight bill" and "billed to the customer," which terms are used interchangeably in the railroad industry, while the term "waybilled" has a distinctively different meaning. We conclude that the trial court properly found that the Agreement is latently ambiguous because the Agreement uses the term "billed" but does not specify whether the referenced term means "waybilled" or "billed to the customer." Therefore, because the Agreement was latently ambiguous, the trial court properly allowed extrinsic evidence to be considered by the jury in order to determine the intention of the parties. *See Nat'l Union, Inc.,* 907 S.W.2d at 520.

The jury heard testimony from Dennis Olmstead, who acted as a consultant for South Plains, and who was involved in the drafting of the Agreement between BNSF and South Plains, regarding the term "billed." He explained the difference between "waybilled" and "freight billed" and the impact of each.[2] Olmstead testified that in the original draft

---

**2.** A waybill is a document prepared by a transportation line at the point of a shipment

of the Agreement, the term "switched" was in the division of revenue paragraph, and that he wanted the term "switched" to be replaced with the term "billed." Specifically, he stated that if the term "switched" was in the Agreement, BNSF could gather trains in its yard and make sure that each train contained more than twenty-seven cars before calling South Plains to come in and "switch" a train. In that event, South Plains would never be able to claim the higher division of revenue, even though more work was required on the part of South Plains. Olmstead testified that when he stated that the term "billed" should replace the term "switched," he meant "waybilled" and not "freight billed." Additionally, he testified that the "freight bill" goes to the customer and not to South Plains. Therefore, South Plains would not have any way to verify the accuracy of the payment. Considering all the testimony at trial, we hold that the evidence is legally and factually sufficient to support the jury's finding that the ambiguous term "billed" meant "waybilled." We overrule BNSF's third issue.

### CONCLUSION

We reverse that portion of the trial court's judgment that pertains to the "continued access" provision of the Agreement. We render a declaratory judgment that the Agreement's "continued access" provision permits BNSF to continue to use track 9200 with no restrictions except payment after five years as provided by the terms of the Agreement. We affirm the remainder of the trial court's judgment.

showing the point of origin, route, description of shipment, and amount charged. A freight bill is a document issued by the carrier based on the waybill and other information. It is

sent directly to the customer and is the document by which the customer compensates the companies for the rail service they provide.