**Affirmed in part; Reversed in part; and Memorandum Opinion filed May 15, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00281-CV

---

## IN THE MATTER OF THE MARRIAGE OF LISA MARIE MCNELLY AND STEPHEN E. MCNELLY AND IN THE INTEREST OF A.M.M, A CHILD

---

**On Appeal from the 18th District Court
Somervell County, Texas
Trial Court Cause No. DO4838**

---

## M E M O R A N D U M   O P I N I O N

In this divorce suit between Stephen E. McNelly and Lisa Marie McNelly, Mr. McNelly challenges the trial court's divorce decree in five issues. First, Mr. McNelly alleges that the trial court erred when it characterized as community property the proceeds from the sale of his separate-property business that were deposited into joint accounts at brokerage firms. Second, Mr. McNelly alleges that the trial court erred when it characterized certain paintings as community property.

Third, Mr. McNelly alleges that the trial court erred when it awarded Mrs. McNelly a $60,000 judgment because the couple's premarital agreement proscribed reimbursement awards. Fourth, Mr. McNelly alleges that the trial court erred when it declined to award him attorney fees. Lastly, Mr. McNelly alleges that the trial court erred when it declined to impose a geographic restriction on Mrs. McNelly, the primary joint managing conservator. We affirm in part and reverse and remand in part.[1]

## FACTS AND PROCEDURAL BACKGROUND

We present only the basic facts here, reserving detailed presentation of the facts for our discussion of each issue. Mr. McNelly and Mrs. McNelly executed a premarital agreement on July 17, 2008 and were married on July 22, 2008. Mrs. McNelly had a daughter, A.M.M., from a previous relationship. Mr. McNelly adopted A.M.M. in May 2010. When Mr. McNelly and Mrs. McNelly married, Mr. McNelly owned and operated Rockin R Gasworks. The couple owned real and personal property prior to the marriage, and they accumulated various items of personal property during the marriage.

Mrs. McNelly filed a petition for divorce on November 29, 2010. Mr. McNelly answered on December 7, 2010 and filed a counter-petition for divorce on December 22, 2010. The couple presented their respective cases to the trial court, and the trial court signed a final decree of divorce on November 21, 2012. On December 21, 2012, Mrs. McNelly and Mr. McNelly filed separate motions for new trial, both of which were denied. The trial court signed findings of fact and conclusions of law on January 23, 2013. On February 19, 2013, Mr. McNelly

---

[1] This case was transferred to our court from the Fort Worth Court of Appeals; therefore, we must decide the case in accordance with its precedent if our decision would otherwise be inconsistent with its precedent. *See* Tex. R. App. P. 41.3.

2

timely filed his notice of appeal.

**DISCUSSION**

**I.     Whether the trial court abused its discretion when, as a result of its interpretation of the couple's premarital agreement, it characterized as community property the proceeds from the sale of Mr. McNelly's business that were deposited into joint brokerage accounts.**

The trial court found that Mr. McNelly owned and operated Rockin R Gasworks prior to the marriage, making Mr. McNelly's interest in Rockin R Gasworks separate property. *See* Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001 (defining separate property), § 3.002 (defining community property) (West 2006). In September 2008, Mr. McNelly sold his interest in Rockin R Gasworks for $1.3 million, and the couple deposited the proceeds into several accounts held at several different financial institutions. Of the $1.3 million, $50,000 was deposited into a Wells Fargo joint savings account. Another $50,000 was deposited into a Wells Fargo joint checking account. The character of the $100,000 deposited into the Wells Fargo accounts is not at issue in this case. Of the remaining $1.2 million, $600,000 was deposited into a brokerage account with Charles Schwab & Co., Inc. ("Schwab"), and $600,000 was deposited into a brokerage account with Fidelity Brokerage Services, LLC ("Fidelity"). Schwab and Fidelity are broker-dealers registered with the Securities Exchange Commission. *See* Annual Audited Report for Period Beginning 1/1/13 and Ending 12/31/13, Fidelity Brokerage Services, LLC, at 3, http://www.sec.gov/Archives/edgar/vprr/14/9999999997-14-001816; Annual Audited Report for Period Beginning 01/01/12 and Ending 12/31/12, Charles Schwab & Co, Inc., at 3, http://www.sec.gov/Archives/edgar/vprr/13/9999999997-13-002328. The trial court's characterization of the deposits into the Fidelity and Schwab accounts is at issue in this case.

3

The trial court concluded that "[t]he parties . . . converted separate property funds, i.e., the $1,300,000 received by Stephen E. McNelly from the sale of Rockin R Gasworks, to community property." This conversion "was accomplished by the deposit of funds received by Stephen R. [sic] McNelly from the sale of his separate property business into *joint accounts* pursuant to the prenuptial agreement executed by Lisa Marie McNelly and Stephen E. McNelly on July 17, 2008, and the comingling of said funds with other community funds." (emphasis added). Mr. McNelly argues that the trial court divested him of his separate property when it characterized the $1.2 million deposited into joint "brokerage" accounts as community property. Mrs. McNelly responds that the court properly characterized the disputed funds as community property because they were deposited into joint "bank" accounts.

Courts employ a two-part test when reviewing alleged characterization errors. *See Jurek v. Couch-Jurek*, 296 S.W.3d 864, 873 (Tex. App.—El Paso 2009, no pet.). Application of this test requires both a showing of error and a showing that the error was harmful. *Id.*; *see Boyd v. Boyd*, 131 S.W.3d 605, 617–18 (Tex. App.—Fort Worth 2004, no pet.). A characterization error is harmful if it causes the trial court to abuse its discretion in dividing the community estate. *Jurek*, 296 S.W.3d at 873; *Boyd*, 131 S.W.3d at 617.

To determine whether the trial court erred in this case, we must ascertain the effect of the premarital agreement on the couple's property interests.[2] Courts interpret premarital agreements like other written contracts. *Williams v. Williams*, 246 S.W.3d 207, 210 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see McClary v. Thompson*, 65 S.W.3d 829, 837 (Tex. App.—Fort Worth 2002, pet.

---

[2] We note that neither party contends on appeal that the premarital agreement is invalid or is not binding.

4

denied). The court's primary concern is ascertaining the intent of the parties as expressed in the instrument. *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794 (Tex. 2012). All contractual provisions must be considered with reference to the whole instrument. *Williams*, 246 S.W.3d at 210. Contract terms are given their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning. *Reeder*, 395 S.W.3d at 794–95. The parties' intent is governed by what is in the contract, not by what one party contends it intended but failed to say and not by whether the contract was wisely made. *U.S. Denro Steels, Inc. v. Lieck*, 342 S.W.3d 677, 682 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 382 (Tex. App.—Fort Worth 2002, pet. denied). The court cannot rewrite or add to the contract's language. *Am. Mfrs. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). Courts construe marital property agreements narrowly in favor of the community estate. *Fischer-Stoker v. Stoker*, 174 S.W.3d 272, 278–79 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Although neither party contends on appeal that the premarital agreement is ambiguous, the question of a contract's ambiguity is one of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam); *May v. Buck*, 375 S.W.3d 568, 579 (Tex. App.—Dallas 2012, no pet.) (court can conclude contract is ambiguous even in absence of such a pleading by either party); *see also Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 322–323 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (whether a term on its face is subject to two or more interpretations is an argument of patent ambiguity). When a potential ambiguity arises, deciding whether the language is ambiguous is an issue of

contract interpretation. *Burlington N. & Santa Fe Ry. Co. v. S. Plains Switching, Ltd.*, 174 S.W.3d 348, 356 (Tex. App.—Fort Worth 2005, no pet.). Parol evidence is not admissible for the purpose of creating an ambiguity. *Id.* at 358. A contract is not ambiguous when the language can be given a definite or certain meaning as a matter of law. *See Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000); *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520; *Burlington*, 174 S.W.3d at 356. We will not find an ambiguity simply because the parties disagree about the contract's meaning. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, — S.W.3d —, No. 11-0050, 2014 WL 1133329, at \*3 (Tex. March 21, 2014). If the written instrument permits the court to ascertain a definite interpretation as to which one of two possible meanings is proper, the contract is not ambiguous, and the court will interpret the contract as a matter of law. *Williams*, 246 S.W.3d at 211; *Burlington*, 174 S.W.3d at 356 (citing *R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518–19 (Tex. 1980)). If the meaning of a contract is uncertain and doubtful or reasonably susceptible to more than one meaning, however, the contract is ambiguous and its meaning must be resolved by the factfinder. *Williams*, 246 S.W.3d at 211; *Burlington*, 174 S.W.3d at 356. The construction of an unambiguous contract is a question of law for the court and is reviewed de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999).

The relevant portions of the premarital agreement provide:

**Art. II.A(1):** Separate Property. Unless otherwise specified in this Agreement and the Schedules hereto, the following shall apply: Any interest in real and personal property, as described in the attached Schedules, that each Party owned prior to marriage, and any mutations thereof, shall remain that Party's separate property after the date marriage.

6

**Art. II.A(4):**    The following property, and any mutations thereof, shall remain the separate property of the party owning the original separate property: (a) Property that is traceable to separate property owned before marriage; (b) Property that is acquired during the marriage from separate property funds alone; (c) Property that is received in exchange for separate property; (d) Property that is purchased with proceeds of sale of separate property; (e) Increases in value of separate property owned before marriage, purchased with separate property or exchanged for separate property.

**Art. II.D:**    Joint Checking Account. The Parties further understand and agree that funds acquired in the future may be deposited into any bank account styled in their joint names. In this event the parties intend that any such monies placed in such an account shall become and remain community property.

Ascertaining the agreement's effect hinges on our interpretation of the undefined term "bank" in article II.D. For the following reasons, we find that the premarital agreement in this case is not ambiguous and that the term "bank" does not include brokerage firms.

First, the agreement expresses the parties' intent to retain the separate-property character of their already-existing separate property. This intent is evident in Recital 7:

> [T]he parties intend that all income arising from [Mr. McNelly's] separate property, and all of the fruits of his time toil, talent and labor shall be the separate property of [Mr. McNelly] and shall remain under the sole ownership, management, and control of [Mr. McNelly] during this marriage, as well as upon dissolution of this marriage by death, divorce, or annulment, unless such separate property is otherwise transferred to [Mrs. McNelly] by will or other written instrument voluntarily executed by [Mr. McNelly].

7

*See All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 561 (Tex. App.—El Paso 2009, no pet.) (recitals are useful in construing the contract and determining the parties' intent); *Burlington*, 174 S.W.3d at 356 (court must consider the entire instrument so that no provision will be rendered meaningless). Mr. McNelly's interest in Rockin R Gasworks was separate property. The couple intended that the fruits of the business, such as the earnings that might result from the sale of the business, should remain Mr. McNelly's separate property.

Second, the plain meaning of the term "bank" in article II.D does not encompass brokerage firms. When a contract leaves a term undefined, we presume that the parties intended its plain, generally accepted meaning. *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011). To ascertain the natural meaning of a common-usage term, courts often consult dictionaries. *Id.* Webster's Dictionary defines "bank" as "an establishment for the custody, loan, exchange, or issue of money, for the extension of credit, and for facilitating the transmission of funds by drafts or bills of exchange." *Webster's Third New Int'l Dictionary* 172 (1993). Black's Law Dictionary similarly defines "bank" as "a financial establishment for the deposit, loan, exchange, or issue of money and for the transmission of funds." *Black's Law Dictionary* 164–65 (9th Ed. 2009). On the other hand, Webster's Dictionary defines "broker" as an "agent middleman who for a fee or commission negotiates contracts of purchase and sale (as of real estate, commodities, or securities) between buyers and sellers without himself taking title to that which is the subject of negotiations and usu[ally] without having physical possession of it." *Webster's Third New Int'l Dictionary* 281–82 (1993). A "broker," according to Black's Law Dictionary, is "an agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation."

*Black's Law Dictionary* 219–20 (9th ed. 2009). A "broker-dealer" is "a brokerage firm that engages in the business of trading securities for its own account before selling them to customers." *Id.* These definitions illustrate that banks and brokers are distinguishable, particularly with respect to the scope of their respective services; banks tend to offer a broader spectrum of financial services than brokerage firms.

Third, federal and state statutory definitions illustrate that banks and brokerage firms generally fall under distinct statutory and regulatory regimes, though under limited circumstances, banks are permitted to provide brokerage services. *See Phila. Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 593 (Tex. App.—Fort Worth 2004, no pet.) (statutory definitions are relevant to interpretation of class member's contracts); *Mescalero Energy, Inc.*, 56 S.W.3d at 323 (statutory definitions can be used to determine commonly understood meaning of industry term). Under title 15 of the United States Code, the term "bank" means:

> (A) a banking institution organized under the laws of the United States or a Federal savings association, as defined in section 1462(5) of Title 12, (B) a member bank of the Federal Reserve System, (C) any other banking institution or savings association, as defined in section 1462(4) of Title 12, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the currency pursuant to section 92a of Title 12, and which is supervised and examined by State or Federal authority having supervision over banks or savings associations, and which is not operated for the purpose of evading the provisions of this chapter, and (D) a receiver, conservator, or other liquidating agent of any institution or firm included in clauses (A), (B), or (C) of this paragraph.

15 U.S.C. § 78c(a)(6) (2012). Under the Texas Finance Code, "bank" means a state or national bank. Tex. Fin. Code Ann. § 31.002(a)(2) (West Supp. 2013). A "state

bank" is a banking association organized under Finance Code subtitle A with the express power to receive and accept deposits and possessing other rights and powers expressly or impliedly granted by subtitle A. *Id.* § 31.002(a)(50). A "national bank" is a banking association organized under United States Code title 12, section 21. *Id.* § 31.002(a)(37). The Texas Business and Commerce Code defines "bank" as "a person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company." Tex. Bus. & Com. Code Ann. § 1.201(a)(4) (West 2009), §§ 4.105(1), 4A.105(a)(1) (West 2002 & West Supp. 2013), § 9.102(a)(8) (West 2013).

The United States Code defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). In Texas, a "broker" or "dealer" includes every person or company who engages in "selling, offering for sale or delivery or soliciting subscription to or orders for, or undertaking to dispose of, or to invite offers for any security or securities . . . ." Tex. Rev. Civ. Stats. Ann. art. 581-4(C), (H) (West 2010). The term includes every person or company that deals in any other manner in any security or securities within the state. *Id.* art. 581-4(C); *see also* 7 Tex. Admin. Code § 3.3 (Tex. Fin. Comm'n, Securities Activities of Subsidiaries of State Banks) (state bank can establish or acquire a subsidiary that engages in securities activities as long as the subsidiary complies with state and federal rules applicable to registered broker-dealers); 34 Tex. Admin. Code § 7.101 (Comptroller of Pub. Accounts, Definitions) (defining "financial institution" to include banks and broker-dealers). A "broker" under the Business and Commerce Code is a "person defined as a broker or dealer under the federal securities laws, but without excluding a bank acting in that capacity." Tex. Bus. & Com. Code Ann. § 8.102(a)(3) (West 2011).

Finally, case law suggests that mere overlap in the services provided by a nonbanking entity, such as a brokerage firm, with the services provided by a bank does not transform the nonbanking entity into a bank. For instance, in *Securities Industry Association v. Board of Governors of the Federal Reserve System*, the United States Supreme Court upheld as reasonable an agency's determination that a bank's proposed acquisition of a discount brokerage firm, a "nonbanking entity" under the applicable statute, was exempt from the strictures of the Bank Holding Company Act, which prohibits banks from acquiring nonbanking entities unless the board determines that the nonbanking activities of a securities brokerage are "closely related" to banking. 468 U.S. 207, 221 (1984); *see* 12 U.S.C. § 1843(c)(8) (2012). The agency had determined that banks offered brokerage services as an accommodation to their customers, utilized the same transaction execution techniques as brokers, employed personnel with similar training and expertise to brokers, and used the same financial facilities as brokers. *Sec. Indus. Ass'n*, 468 U.S. at 211–12. The agency also concluded that banks are generally equipped to offer the same type of discount brokerage services provided by a brokerage firm. *Id.* at 212. Essentially, the agency determined that the bank possessed the capability to function as a broker-dealer; it did not determine that broker-dealers could likewise function as banks.

In *Brenham Production Credit Association v. Zeiss*, the City of Brenham sought to levy taxes on a credit association, arguing that the credit association was taxable as a "banking corporation" under then-applicable law. 264 S.W.2d 95, 133 (Tex. 1953). Because the credit association's purpose was limited to providing short-term loans to shareholder farmers for agricultural purposes and despite the fact that banks do loan money—just as some banks do offer brokerage services— the Texas Supreme Court held that the credit association was not a banking

11

corporation for taxation purposes. *Id.* at 136. Similarly, in this case, broker-dealers Schwab and Fidelity perform a limited function—facilitating the purchase and sale of securities for their clients. The fact that banks offer similar services does not make Schwab or Fidelity equivalent to a bank.

Citing two out-of-state cases, Mrs. McNelly argues that brokerage firms providing check-writing privileges are "uniformly" viewed as banks under the Uniform Commercial Code (UCC). Particularly, she equates the Schwab brokerage account with a bank account because Schwab provided check-writing privileges in conjunction with the brokerage account. The cases Mrs. McNelly cited are distinguishable; they stand for the proposition that a brokerage firm cannot use its status as a nonbanking entity to shield itself from UCC article 4 liability when it either charges a customer's account on a check that was not properly payable or fails to give proper notice of dishonor. *See, e.g.*, *Nisenzon v. Morgan Stanley DW, Inc.*, 546 F. Supp. 2d 213, 224–25 (E.D. Pa. 2008); *Edward D. Jones & Co. v. Mishler*, 983 P.2d 1086, 1095 (Or. Ct. App. 1999). In this case, we are not assessing Fidelity or Schwab's liability to another individual under the UCC; rather, we are defining a term for the purpose of interpreting a contract in accordance with the parties' express intent. Mrs. McNelly has not cited and we have not found any binding authority equating banks with brokerage firms in the context of interpreting a premarital agreement, and we decline to do so in this case.

Based on the foregoing and in keeping with the couple's express intent as memorialized in their premarital agreement, we conclude that the premarital agreement is not ambiguous because the plain meaning of "bank" is ascertainable and does not include brokerage firms like Fidelity and Schwab. The premarital agreement states that any separate-property funds deposited into joint "bank" accounts would become community property. None of the separate-property funds

at issue in this case was deposited into joint "bank" accounts. Therefore, none of the separate-property funds at issue in this case became community property. The trial court erred when, based on its erroneous interpretation of the unambiguous premarital agreement, it characterized as community property the $1.2 million from the sale of Rockin R Gasworks that was deposited into the joint brokerage accounts at Schwab and Fidelity.

We must now decide whether the trial court's mischaracterization resulted in harm. Mischaracterization of community property as separate property is harmful and requires reversal only if the mischaracterization affects the just and right division of the community estate. *Boyd*, 131 S.W.3d at 617. We need not reverse the trial court if the mischaracterization has only a de minimis effect on the division. *Id.* On the other hand, if a trial court mischaracterizes separate property as community property—as the trial court did here—the error is by definition harmful, and we must reverse and remand because the subsequent division of the community estate would divest the spouse of his or her separate property. *Barnard v. Barnard*, 133 S.W.3d 782, 790 (Tex. App.—Fort Worth 2004, pet. denied); *Smith v. Smith*, 22 S.W.3d 140, 147 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)); *see also* Tex. Const. art. XVI, § 15.

Mrs. McNelly argues that even if the trial court erred, the error was harmless because the brokerage accounts were joint accounts, giving Mrs. McNelly a right to half of the funds, despite their separate character. Mrs. McNelly's position is untenable. Under the Estates Code, a joint account is an account payable on request to one or more of two or more parties, regardless of whether there is a right to survivorship. Tex. Estates Code Ann. § 113.004(2) (West 2013).[3] A joint account

---

[3] *See also* Acts 2009, 81st Leg., R.S., ch. 680 (enacting Texas Estates Code, effective Jan.

13

belongs to the parties in proportion to the net contributions by each party to the sums on deposit unless there is clear and convincing evidence of a different intent. *Id.* § 113.102 (West 2013). The accounts at Schwab and Fidelity were joint accounts. Mrs. McNelly had the right to withdraw funds from these accounts, and the brokerage firms were entitled to pay Mrs. McNelly without incurring liability. *See id.* § 113.203(a) (West 2013) (protecting financial institutions from liability). However, Mrs. McNelly's interest in the account was not equal to Mr. McNelly's interest unless Mrs. McNelly deposited an equal amount of funds into the account or presented clear and convincing evidence that she and Mr. McNelly intended for Mrs. McNelly to have an equal interest. The record contains no evidence that Mrs. McNelly deposited an equal amount of funds into the brokerage accounts, and Mrs. McNelly does not argue on appeal that she and Mr. McNelly intended equal ownership in the joint accounts, let alone that such an intent was proved by clear and convincing evidence. Mrs. McNelly's reliance on *Holmes v. Beatty*, 290 S.W.3d 852 (Tex. 2009), in support of her position is also misplaced. The issue in that case was whether a married couple intended to create rights of survivorship in their joint investment accounts, which contained community-property funds, not whether each spouse owned an equal share of the funds held in the joint investment accounts. *Holmes*, 290 S.W.3d at 853–54, 862.

Advancing a similar argument but citing the inception-of-title rule, Mrs. McNelly further contends that Mr. McNelly's $1.2 million in separate property immediately became her and Mr. McNelly's separate property in equal shares once it was deposited into the joint brokerage accounts. Mrs. McNelly did not cite any authority for this proposition, and we reject it. The character of property is determined by the inception of title. *Boyd*, 131 S.W.3d at 612. Inception of title

1, 2014).

14

occurs when the right to own or claim the property arises. *Harrell v. Hochderffer*, 345 S.W.3d 652, 658 (Tex. App.—Austin 2011, no pet.); *Boyd*, 131 S.W.3d at 612; *see* Tex. Fam. Code Ann. § 3.404(a) (West Supp. 2013). The trial court found that Rockin R Gasworks was Mr. McNelly's separate property because he owned an interest in the business prior to the marriage. The parties stipulated that $1.2 million of the proceeds from the sale of Mr. McNelly's partnership interest were deposited in equal amounts into the Schwab and Fidelity brokerage accounts. This means that the $1.2 million is traceable to Mr. McNelly's separate-property interest in Rockin R Gasworks. Mrs. McNelly did not acquire a one-half ownership interest in Mr. McNelly's separate property simply because his separate property was deposited into joint accounts. *See* Tex. Estates Code Ann. § 113.102. Mrs. McNelly's arguments in favor of an equal distribution of the funds despite the court's erroneous characterization must fail.

The trial court mischaracterized Mr. McNelly's separate property as community property and committed harmful error. This error caused the trial court to abuse its discretion in the division of the community estate. *See Jurek*, 296 S.W.3d at 873; *Barnard*, 133 S.W.3d at 789–90. We sustain Mr. McNelly's first issue.

## II. Whether the trial court erred when it characterized the paintings "Move'em Out," "Upstream in Hurry," and "El Gringo" as community property.

The trial court awarded the paintings "Move'em Out," "Upstream in a Hurry," and "El Gringo" to Mrs. McNelly in the divorce decree. Mrs. McNelly concedes that these three paintings are Mr. McNelly's separate property. Mr. McNelly's second issue is sustained.

15

**III. Whether the trial court erred when it awarded Mrs. McNelly a $60,000 judgment.**

The divorce decree awarded a judgment of "$66,000 payable by Stephen E. McNelly to Lisa Marie McNelly on or before the 30[th] day after entry of this Decree of Divorce, by cash, cashier's check, or money order." Mr. McNelly challenges only $60,000 of that judgment. He argues that the money judgment was to satisfy Mrs. McNelly's reimbursement claim, and as such, the judgment violates the premarital agreement. He bases his assertion on the fact that the court, in its conclusions of law, "took into consideration" the parties' claims for reimbursement and attorney fees. Since the court decided that each party should bear its own attorney fees, Mr. McNelly concludes that the money judgment must have been for reimbursement. We disagree.

A trial court has wide discretion in dividing the parties' estate and should be overturned only when it appears that the division was so manifestly unjust and unfair as to constitute an abuse of discretion. *Loaiza v. Loaiza*, 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.); *Belz v. Belz*, 667 S.W.2d 240, 245 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). The trial court can award a money judgment to one spouse in order to achieve an equitable division or to satisfy a spouse's reimbursement claim. *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998); *Belz*, 667 S.W.2d at 245.

We interpret the trial court's decision in this case as an effort to achieve an equitable division of the community estate and not as a reimbursement judgment for two reasons. First, the trial court never characterizes the $60,000 award as a reimbursement judgment. *See* Tex. Fam. Code Ann. § 7.007 (West Supp. 2013) (court shall determine the rights of both spouses in a claim for reimbursement); *see, e.g.*, *Heggen v. Pemelton*, 836 S.W.2d 145, 146 n.1 (Tex. 1992) (trial court's

decree contained a judgment to equalize the division of community property and a separate judgment for reimbursement); *Garcia v. Garcia*, 170 S.W.3d 644, 647 (Tex. App.—El Paso 2005, no pet.) (divorce decree specifically found that one spouse was entitled to reimbursement and awarded a judgment accordingly). Second, the couple's premarital agreement placed specific limits on the couple's reimbursement rights:

> If the marriage of the Parties terminates for any reason, either Party waives any right to claim reimbursement to his or her separate or community property estate for expenditure of his or her separate or community property or income from such property used to repay a credit transaction made by the other party.

Because we have already concluded that the trial court mischaracterized the sale proceeds that were deposited into joint brokerage accounts, we need not determine whether the trial court abused its discretion in awarding the $60,000 to Mrs. McNelly as part of the equitable division of the community estate. Instead, in light of our decision in Section I above, we leave it to the trial court on remand to achieve a just and right division of the community estate. *See Boyd*, 131 S.W.3d at 618; *Smith*, 22 S.W.3d at 153; *McElwee v. McElwee*, 911 S.W.2d 182, 190 (Tex. App.—Houston [1st Dist.] 1995, writ denied). Mr. McNelly's third issue is overruled.

## IV. Whether the trial court erred when it declined to award Mr. McNelly attorney fees.

The trial court determined that each party should bear its own attorney fees. With regard to attorney fees, article II.K of the premarital agreement provides:

> If either Party brings an action or other proceeding to enforce this Agreement or to enforce any judgment, decree, or order made by a court in connection with this Agreement, and such enforcement is contested, the Party seeking enforcement, if successful, shall be entitled to recover reasonable attorney's fees and other necessary

17

costs from the other party.

In the event that the marriage is terminated by divorce, . . . it is agreed that neither party can recover from the other (or his or her property) any attorney's fees, . . . which relate to services rendered towards the assertion of claims against the other Party's separate estate or separate assets.

If either party unsuccessfully seeks to invalidate some or all of this Agreement, or unsuccessfully seeks to recover property in a manner at variance with this Agreement, then such party shall be liable to the other party for all reasonable and necessary attorney's fees and litigation expenses incurred by such other party in successfully defending his or her rights under this Agreement.

The first sentence of this provision is concerned with actions to enforce the agreement. The second sentence is concerned with suits for divorce. The third sentence is concerned with actions to invalidate the agreement. Citing only the first sentence, Mr. McNelly argues that he was entitled to attorney fees because he had to file a "Counter Petition to Enforce the Premarital Agreement" and was ultimately successful in his bid to enforce the agreement. He contends that his petition constituted an action or proceeding to enforce the premarital agreement. Mr. McNelly's argument lacks merit.

Mr. McNelly actually filed a "Counter Petition for Divorce," in which he asked the trial court to enforce the premarital agreement. A suit for divorce is an action to terminate a valid marriage, not an action to enforce a contract. *See Estate of Claveria v. Claveria*, 615 S.W.2d 164, 167 (Tex. 1981) (marriage can only be terminated by death or court decree); *Robertson v. Melton*, 115 S.W.2d 624, 628 (Tex. 1938) (breach of contract suit is an action to enforce the contract); *EOG Resources, Inc. v. Hurt*, 357 S.W.3d 144, 147–48 (Tex. App.—Fort Worth 2011, pet. denied) (same); *Trinity Universal Ins. Co. v. Sweatt*, 978 S.W.2d 267, 270 (Tex. App.—Fort Worth 1998, no pet.) (suit for declaratory judgment is an action to enforce a contract); 39 Tex. Jur. 3d *Family Law* § 335 (2011) (divorce suit is an

18

action to release spouses from the bonds of matrimony); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (West 2008) (defining subject matter of declaratory judgment actions to include determination of rights under a contract). Asking the court to enforce a premarital agreement within a divorce petition does not alter the nature of this case; it remains a divorce suit and triggers the second attorney-fee provision that precludes either party's recovery of attorney fees. We conclude, therefore, that the trial court did not err when it declined to award attorney fees to Mr. McNelly. Mr. McNelly's fourth issue is overruled.

## V. Whether the trial court erred when it declined to impose a geographic restriction upon Mrs. McNelly.

The divorce decree gave Mrs. McNelly the exclusive right to designate A.M.M.'s primary residence and did not impose a geographic restriction on that right. Mr. McNelly argues that the trial court abused its discretion when it granted Mrs. McNelly the exclusive right to designate A.M.M.'s primary residence without regard to geographic location because "there is no legal or factual evidence to support the trial court's decision." He further argues that the lack of a geographic restriction is contrary to A.M.M.'s best interest because it denies his daughter meaningful contact with her father. We disagree.

Conservatorship decisions are reviewed for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). A trial court abuses its discretion if it acts without reference to any guiding principles; that is, if the court's decision was arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *In re M.M.M.*, 307 S.W.3d at 849. Legal and factual sufficiency are not independent grounds of error but are relevant factors in deciding whether the court abused its discretion. *In re M.M.M.*, 307 S.W.3d at 849. In determining whether the trial court abused its

19

discretion because the evidence was legally or factually insufficient, we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *Id.* Traditional sufficiency review comes into play with regard to the first question, and with regard to the second question, we determine whether the trial court made a reasonable decision. *Id.*

When a court appoints both parents as joint managing conservators, it must designate to one of them the exclusive right to determine the child's primary residence, with or without geographic restrictions. Tex. Fam. Code Ann. § 153.134(b)(1) (West 2014). The Texas Family Code provides some basic guiding principles for courts making these decisions. First, the best interest of the child is the court's primary consideration in determining issues of conservatorship and possession of and access to the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *see also Lenz v. Lenz*, 79 S.W.3d 10, 14–16 (Tex. 2002) (best-interest factors); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (best-interest factors). Second, the public policy of this state is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. *Id.* § 153.001 (West 2014).

At the time of the trial, Mrs. McNelly was living in Parker County with A.M.M., the couple's daughter. Mrs. McNelly had lived intermittently in the Parker County residence for thirteen years. Mr. McNelly was living in Somervel County at the time of trial, less than 40 miles from Mrs. McNelly's Parker County residence. *See In re P.M.G.*, 405 S.W.3d 406, 413 (Tex. App.—Texarkana 2013,

no pet.) (taking judicial notice of distance between Texarkana and Denton). A.M.M. attended private school in Tarrant County, near the Parker County residence. Although Mrs. McNelly did testify that the job market would factor into any decision to relocate, the record contains no evidence that she actually intended to relocate.

For his part, Mr. McNelly did not present any evidence that the trial court's decision would limit his ability to maintain contact with his daughter. He presented no evidence that a geographic restriction would be in A.M.M.'s best interest and no evidence that the lack of a geographic restriction was not in A.M.M.'s best interest. He presented no evidence that his ability to maintain contact with A.M.M. had been or would be negatively impacted unless the court imposed a geographic restriction. The only evidence that Mr. McNelly presented in his favor was that he had multiple children and grandchildren and that he intended to convert his son's bedroom into A.M.M.'s bedroom once his son left for college. While this evidence shows that Mr. McNelly had experience raising children and was making an effort to provide a stable home life for A.M.M., it does not support the imposition of a geographic restriction, especially considering uncontroverted testimony that Mr. McNelly inconsistently exercised his visitation rights with A.M.M. *See, e.g.*, *Morgan v. Morgan*, 254 S.W.3d 485, 489 (Tex. App.—Beaumont 2008, no pet.) (court of appeals upheld imposition of geographic restriction on mother who wanted to move to Louisiana when father exercised visitation rights consistently, testified that the children did not know the relatives in the new location, testified that the mother had previously threatened to move away, presented evidence that the children's grandparents visited every weekend, and presented evidence that the children were performing well in school); c*f. Lenz*, 79 S.W.3d at 21 (in a modification suit, the Texas Supreme Court removed geographic restriction on

mother who wanted to relocate from the United States to Germany because, among other things, the mother's personal well-being, the children's existing connections to Germany, and the father's ability to adjust his employment situation all weighed in favor of lifting the restriction).

We cannot say that the trial court's decision was arbitrary or unreasonable. The trial court did not abuse its discretion when it declined to impose a geographic restriction on Mrs. McNelly's right to determine A.M.M.'s residence. Mr. McNelly's fifth issue is overruled.

## CONCLUSION

Because the trial court erred in its interpretation of the premarital agreement, we reverse the portion of the trial court's decree dividing the marital estate and remand for further proceedings in accordance with this opinion, including a determination of the community estate and a just and right division of the parties' community property. *See Williams*, 246 S.W.3d at 216. We affirm the remainder of the divorce decree.


/s/          Marc W. Brown
                  Justice

Panel consists of Justices Boyce, Christopher, and Brown.